UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 03-30294-MAP

---

WARREN PARTELOW,
PLAINTIFF
V.
COMMONWEALTH OF MASSACHUSETTS,
HAMPDEN COUNTY CORRECTIONAL CENTER,
MICHAEL ASHE JR., SHERIFF OF HAMPDEN COUNTY;
THOMAS CONKLIN, SUPERINTENDENT OF HEALTH SERVICES OF
HAMPDEN COUNTY CORRECTIONAL CENTER, CPT. WALKER,
CPT. SADDI, AND CERTAIN JOHN DOES,
DEFENDANTS

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Now come the defendants in the above-captioned matter, and move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds that, based upon the record before the court, they are entitled to summary judgment as a matter of law.

### SUMMARY OF PLAINTIFF'S CLAIMS.

Plaintiff Warren Partelow claims that the defendants violated his civil rights, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Rehabilitation Act (RA), 29 U.S.C. §§ 706, 791-794, Massachusetts General Law chapter 272, § 98, and Article 114 of the Amendments to the Massachusetts Constitution, and are liable for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress, by failing to provide him with handicapped accessible shower facilities when he was an inmate at Hampden County Correctional Center. The defendants deny Partelow's allegations and submit that he cannot support a cause of action under any federal or state law.

## CONCISE STATEMENT OF MATERIAL FACTS

1) Plaintiff Warren Partelow filed the instant action against the defendants on September 26, 2003. *See* App. 189 (Verified Complaint).

2) The Hampden County Correctional Center is owned and operated by the Commonwealth of Massachusetts. *See* App. 233 (Defendant's Answers to Plaintiff's Interrogatory number 3).

3) Defendant Michael J. Ashe, Jr. is the Sheriff of Hampden County and an employee of the Commonwealth of Massachusetts. *See* App. 208 (Defendants' Answer paragraph 6).

4) Defendant Thomas Conklin is the Director of Health Services at the Hampden County Correctional Center is an employee of the Commonwealth of Massachusetts. *See* App. 209 (Defendants' Answer paragraph 7).

5) In 1996, Partelow's lower left leg was amputated following an industrial accident as a result of complications relating to poor circulation. *See* App. 222 (Plaintiff's Answers to Interrogatory 7).

6) Prior to January of 2001, Mr. Partelow was incarcerated at the Hampden County Correctional Center on several different occasions. During an intake screening on May 3, 2000, Mr. Partelow stated that his stump will bleed occasionally. *See* App. 21 (Intake Screen).

7) During the time that Mr. Partelow was incarcerated in January of 2001, the showers in the housing units at Hampden County Correctional Center underwent renovations and were retrofitted to be handicap accessible. When the handicap accessible shower in Mr. Partelow's pod became temporarily unavailable due to the renovations, several different arrangements were

2

made in an attempt to reasonably accommodate him so that he could shower safely. *See* App. 281 (Affidavit of Robin Powell ¶ 3).

8)  On January 2, 2001, Mr. Partelow underwent a new inmate intake screening with personnel from the Department of Health Services, during which it was noted that Mr. Partelow was being treated for an existing infection on the stump of his left leg. *See* App. 8 (Intake Screen). Due to his infection, Mr. Partelow was using a wheelchair and not his prosthesis. *See* App. 136. Thereafter, Mr. Partelow was seen on a regular basis by Health Services personnel for wound cleaning, dressing changes and evaluation of the infection on his stump. *See* App. 136 to 174 and 285 (Affidavit of Kathleen Wyler, R.N.).

9)  On January 5, 2001, Partelow was moved to Pod A-1. *See* App. 290 (Classification and Movement Record) and 281 (Affidavit of Robin Powell).

10) On January 6, 2001, a nurse from the Department of Health Services entered an order for Mr. Partelow to have two pillows for medical reasons so that he could elevate his left leg. *See* App. 67 (Incident Report).

11) On January 7, 2001, a nurse from the Department of Health Services entered an order allowing Mr. Partelow to wear gloves to push himself in his wheelchair. *See* App. 66 (incident report).

12) While Partelow was housed in A Tower, renovations began on the showers in the unit and the handicapped shower bars were temporarily removed. *See* App. 281 (Affidavit of Robin Powell)  When Partelow brought the difficulty the absence of a shower bar presented to him to the attention of the correctional officers in the pod, he was given a plastic

chair as an accommodation that he could sit down while he showered. *See* App. 257 (Partelow deposition Tr. 62)

13) On January 9, 2001, Partelow submitted a request to speak with Sheriff Ashe about the shower stalls and hand rails. *See* App. 279.

14) On January 10, 2001, Partelow spoke with Sheriff Ashe during one of the sheriff's routine inspections of the jail. *See* App. 338 (Classification and Movement Record) and 281 (Affidavit of Robin Powell). At that time, Partelow mentioned to Sheriff Ashe that he previously had fallen twice in the showers, but Partelow provided no details and described no injuries and failed to report these alleged falls on the dates and times they are alleged to have occurred. *See* App. 338. Sheriff Ashe told Partelow that he would move Partelow to another pod that had handicap accessible showers. *See* App. 255 (Partelow deposition Tr. 56-14-15). Partelow agrees that Sheriff Ashe treated Partelow with dignity and respect during their meeting. *See* App. 255 (Partelow deposition Tr. 56-14-18).

15) Following Partelow's conversation with Sheriff Ashe, Partelow was transferred from A Tower to Pod C-3 on January 10, 2001 with "all C3 privileges", where he had access to a handicap accessible shower. *See* App. 337 (Classification and Movement Record) and App. 282 (Affidavit of Robin Powell).

16) Pod C-3 is used to house special management inmates who pose a threat to the safety of themselves and others and to security and the orderly management of the facility. Consequently, inmates housed in Pod C-3 are subject to certain restrictions. *See* App. 282 (Affidavit of Robin Powell ¶ 7).

4

17) On January 11, 2001, Partelow submitted an inmate request form complaining that his wheelchair felt loose and requested another wheelchair. *See* App. 65 (Inmate Request). He was promptly given a replacement wheelchair to use while his original chair was repaired. *See id.*

18) Partelow had no problems using the handicap accessible showers in C Tower, and never fell while using those showers. *See* App. 257 (Partelow deposition Tr. 63-20-23). Nevertheless, this temporary accommodation was unacceptable to Partelow, who advised the Classification Board that "he did not want to stay here in C3 if he gets non-contact visits" and that he would "rather stay in Davis [A] One." *See* App. 257 (Partelow deposition Tr. 63-24 to 64-2).

19) On January 12, 2001, at Partelow's request, Partelow was moved back to Pod A-1, where he knew renovations of the showers were still in progress. *See* App. 291 (Classification and Movement Record) and App. 282 (Affidavit of Robin Powell).

20) On January 13, 2001, in still another attempt to accommodate Mr. Partelow, an order was written instructing that Partelow could shower in the Department of Health Services due to the renovations to the showers in Pod A-1. *See* App. 153. Kathleen Wyler, R.N., Clinical Nurse Specialist, personally coordinated these showers with Mr. Partelow. (*See* Wyler Affidavit App. 285)

21) Between January 14, 2001, and February 1, 2001, Partelow showered almost daily, some 15 times, in the Department of Health Services. *See* App. 295 to 329 (Health Services 2001 Diary) and App. 286 (Affidavit of Kathleen Wyler, R.N.).

5

22) On January 27, 2001, Partelow refused to shower in the Department of Health Services. *See* App. 317 (Health Services 2001 Diary).

23) On January 30, 2001, Partelow was moved to Pod. C-4, where he had access to handicapped accessible showers. *See* App. 292 (Classification and Movement Record) and App. 282 (Affidavit of Robin Powell).

24) On January 31, 2001, Partelow was moved to Pod B-2. *See* App. 292 (Classification and Movement Record) and App. 282 (Affidavit of Robin Powell).

25) On February 6, 2001, Partelow submitted an inmate Grievance Form, wherein he requested access to a handicap accessible shower while the showers in the Pod B-2 were being renovated. *See* App. 62.

26) On February 7, 2001, Assistant Superintendent Robin Powell spoke with Dr. Thomas Conklin regarding Partelow's request; they determined that Partelow would be allowed to shower in the Health Services Department while the showers in Pod B-2 were being renovated. *See* App. 62 and App. 283 (Affidavit of Robin Powell).

27) Thereafter, Assistant Superintendent Powell directed Kathy Wyler, R.N., Clinical Nurse Specialist, to accommodate Partelow's showers in Health Services during the renovations to the showers in his pod. *See* App. 62 and App. 283 (Affidavit of Robin Powell).

28) On February 8, 2001, Assistant Superintendent Powell replied in writing to Partelow, informing him that he would be able to shower in the Health Services Department, and apologizing for the inconvenience while the showers were being renovated in the unit. Assistant Superintendent Powell explained to him that each pod would have a handicapped accessible

6

shower after the renovations. *See* App. 62 App. 283 (Affidavit of Robin
Powell).

29) Between February 9th and 16th, 2001, Partelow showered daily, some 8
times, in the Department of Health Services. *See* Health Services 2001
Diary entries, App. 295-229 App. 286 (Affidavit of Kathleen Wyler).

30) Partelow admits that smoking contributed to his circulatory problems and
exacerbated his medical condition. *See* App. 265 and 267 (Partelow depo-
sition Tr. 94-9-10 and 103-7-11).

31) Partelow has been incarcerated at the Hampden County Correctional Cen-
ter on several occasions. *See* App. 190 (Complaint ¶10).

32)  In 2000, Partelow was incarcerated from May 3rd until June 21st, and
again from August 29th to September 1st. *See* App. 190 (Complaint ¶10).

33) In 2001, Partelow was incarcerated at the Hampden County Correctional
Center from January 2nd until May 22, 2001. *See* App. 190 (Complaint
¶11 ) App. 281 (Affidavit of Robin Powell).

34) Partelow understood that he was moved to C Tower because that unit had
handicap accessible showers. *See* App. 249 (Partelow deposition Tr. 31-6-
9).

35) While he was in B Tower, Partelow admits he never filed a grievance
about the shower conditions in B Tower because he claims he was not
given any "paperwork," but Partelow admits that he did not ask his coun-
selor or anybody in the library or at the church programs for paper in order
to submit a grievance; in fact, he stated at his deposition that he "didn't
ask anybody for nothing." *See* App. 253 (Partelow deposition Tr. 45-23 to
46-7.

36) Partelow admits that he never was punished for complaining about the shower situation. *See* App. 2654 (Partelow deposition Tr. 96-18-23.

37) Partelow admits that the medical staff in the Department of Health Services were respectful of him during his incarceration and has stated that he "had no complaints about the medical staff" or the quality of the medical care he received at the Hampden County Correctional Center. *See* App. 254 (Partelow deposition Tr. 51-19 to 53-15).

38) Massachusetts General Law Chapter 258, the Massachusetts Tort Claims Act, requires that a claimant present the "executive officer" of a public employer sufficient written notice of the claim, and that in the case of the Commonwealth, such written presentment shall be made "to the attorney general." *See* G.L. c. 258, § 4.

39) On April 1, 2003 Plaintiff, through counsel, sent a letter purporting to be a "NOTICE OF LIABILITY - Personal Injury" to Hampden County Jail and House of Correction and Correctional Center at Stony Brook, William F. Galvin, Secretary of the Commonwealth of Massachusetts; Michael J. Ashe, Jr.; Thomas Conklin; and William Fitzgerald. *See* App. p. 204-207.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c), summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir. 1993). A fact is material if, based upon the substantive law at issue, it might affect the outcome of the case. *See Anderson*, 477 U.S. at 248; *Mack v. Great Atl. and Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir. 1989). A material

issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact
to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at
248; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir. 1989).

## ARGUMENT

**1. THE DEFENDANTS FULLY COMPLIED WITH THE ADA, THE RA, AND MASSACHUSETTS LAW BY MAKING A GOOD FAITH EFFORT TO PROVIDE A REASONABLE ACCOMMODATION TO PARTELOW WHILE THE SHOWERS AT THE HAMPDEN COUNTY CORRECTIONAL CENTER WERE BEING RENOVATED.**

In Counts I, II, III, and IV, Partelow claims that the defendants violated
his rights as a handicapped individual under the ADA, the RA, Massachusetts
G.L. Chapter 272, § 98, and Article 114 of the Amendments to the Massachusetts
Constitution. Specifically, he alleges that the defendants discriminated against
him because of his disability by denying him access to handicapped accessible
shower facilities or to a reasonable accommodation while he was incarcerated.
The record, including Partelow's own deposition testimony, however, demon-
strates that the defendants did in fact make a good faith effort – indeed, a success-
ful effort -- to accommodate Partelow during the renovations of the showers at
Hampden County Correctional Center and therefore, did not violate the ADA, the
RA, Chapter 272, or Article 114.

Title II of the ADA provides that "no qualified individual with a disability
shall, by reason of such disability, be excluded from participation in or be denied
the benefits of the services, programs, or activities of a public entity, or be sub-
jected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the
RA provides that "[n]o otherwise qualified individual with a disability . . . shall,
solely by reason of her or his disability, be excluded from the participation in, be
denied the benefits of, or be subjected to discrimination under any program or ac-

9

tivity receiving Federal financial assistance." 29 U.S.C. § 794. Both the ADA and the RA define the term "individual with a disability" to be "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 706(8)(B); *see also* 42 U.S.C. § 12101(2).

In addition to the federal statutes, handicapped individuals in Massachusetts are protected from discrimination based upon their disability by G.L. c. 272, § 98, and Article 114 of the Amendments to the Massachusetts Constitution. Chapter 272, § 98, prohibits discrimination based upon physical disability in any "place of public accommodation." MASS. GEN. LAWS ch. 272, § 98. Article 114 states that "[n]o otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth." MASS. CONST. art. CXIV (1980). Massachusetts courts have interpreted the term "handicapped" in Article 114 to have essentially the same meaning as the term "disability" as used in the RA, "i.e., a 'handicapped' individual for purposes of art. 114 is an individual who has 'a physical or mental impairment that substantially limits one or more major life activities.'" *Shedlock v. Dept. of Corr.*, 442 Mass. 844, 852 (2004) For the limited purposes of this motion, there is no dispute that Partelow, a left leg amputee, is a "qualified individual with a disability" under the ADA and the RA.

Partelow's complaint that the defendants denied him access to a handicapped accessible shower or a reasonable accommodation when the showers were being renovated must be viewed in light of the fact that he was at the time an in-

10

mate at the Hampden County Correctional Center. Indeed, several courts have acknowledged that special consideration is necessary when applying the various statutes that protect the disabled in the prison setting. In *Shedlock*, the Massachusetts Supreme Judicial Court "recognized that art. 114 (and therefore comparable provisions in the ADA and the RA) cannot be applied literally as an absolute in all instances," and specifically noted that "[t]his is particularly true in the prison setting." *Shedlock*, 442 Mass. at 855 (internal quotation marks omitted). *Shedlock* cited *Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994) (finding that prison's policy of denying food service jobs to inmates who tested positive for HIV did not violated the RA), a Ninth Circuit opinion that dealt with the application of the ADA and the RA in prisons. In *Gates*, the Ninth Circuit explained that,

> just as constitutional rights of prisoners must be considered in light of the reasonable requirements of effective prison administration, so must statutory rights applicable to the nation's general population be considered in light of effective prison administration. The [RA] was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the [RA] to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration. (emphasis added)

*Gates*, 39 F.3d at 1446-47. Thereafter, Seventh Circuit addressed the application of the ADA and the RA in prisons in *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481 (7th Cir. 1997), *abrogated on other grounds*, *Erickson v. Bd. Of Governors of State Colls. & Univs. For Northeastern Ill. Univ.*, 207 F.3d 945 (7th Cir. 2000). Although the Seventh Circuit acknowledged that the ADA applies to prisoners, it noted that "[t]erms like 'reasonable' and 'undue' are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory." *Crawford*, 115 F.3d at 487. More recently, the Eleventh Circuit

noted that "courts must be mindful of the necessary balance between the ADA's worthy goal of integration and a prison's unique need for security, safety, and other penological concerns. *Miller v. King*, 384 F.3d 1248, 1266 (11th Cir. 2004).

"The determination of a reasonable accommodation is a cooperative process in which [both parties] must make reasonable efforts and exercise good faith." *Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir. 1996); *see also Phelps v. Optima Health, Inc.*, 251 F.3d 21, 27-28 (1st Cir. 2001) (affirming summary judgment on employee's ADA and RA claims in favor of employer after finding that employer acted in good faith to provide reasonable accommodation); *Stultz v. Reese Bros., Inc.*, 835 A.2d 754, (PA Super. 2003) ("The search for an appropriate reasonable accommodation is best determined through a flexible, interactive process.").

During Partelow's incarceration at the Hampden County Correctional Center in 2001, the showers in the housing units were renovated and retrofitted, all in accordance with ADA requirements. The end result was updated shower facilities with a handicapped accessible shower in each housing unit. During the renovations, however, the handrails in some of the handicapped accessible showers were temporarily removed as part of the process of installing new stainless steel showers. Partelow's main contention is that the defendants refused to reasonably accommodate him during the shower renovations. Applying the above principles to the present case, it is clear that the defendants complied with both state and federal law when by offering reasonable accommodations to Partelow while the showers in the housing units were being renovated. His allegation is patently false, as his own deposition testimony demonstrates. In fact, after the defendants learned that Partelow desired an accommodation while the handi-

12

capped accessible shower in his housing unit was unavailable, they fully complied with their duty by making a good faith effort to provide reasonable accommodations to Partelow.

40)    While housed in Pod A-1, Partelow was given a so that he could sit down while he showered, after he informed the defendants that he had difficulty showering without the handrails. When, for some reason, the shower chair proved unacceptable to Partelow, at his request he was transferred to Pod C-2, which had handicapped accessible showers available at that time. Although the showers in Pod C-3 were handicapped accessible, that tower is a maximum security area where the inmates are necessarily subject to certain restrictions due to their classification status. Partelow, who after speaking with the Sheriff personally, was moved to C-3 solely for the purpose of allowing him access to handicapped accessible showers and not because of his classification status, with "all C3 privileges." *See* App. 337 (Classification and Movement Record) and App. 282 (Affidavit of Robin Powell). But Partelow immediately requested that he be moved out of C tower because he did not care for the "non contact" visit policy in C tower, and because he would "rather stay in Davis [A]" where he knew the showers stalls were still under renovation. (App 257). Respecting his wishes, Partelow was returned to Pod A-1, where the showers were still in the process of being renovated. Thereafter, under special arrangements, Partelow was permitted to use the handicap accessible showers in the Department of Health Services, which he visited daily for wound cleaning, dressing change and evaluation of the infection on his stump.

13

Thus, Partelow's allegation that the defendants simply refused to provide him with a reasonable accommodation is demonstrably false. The record is replete with evidence that the defendants made a good faith, successful effort to find a reasonable accommodation for Partelow, while at the same time fulfilling their duty to maintain the safety, security, and orderly management of the facility. As such, Partelow's claims under the ADA, the RA, chapter 272, and Article 114 are without merit.

## 2. THE DEFENDANTS DID NOT VIOLATE PARTELOW'S STATE CIVIL RIGHTS.

Partelow claims that the defendants violated his rights under Massachusetts General Laws chapter 12, § 11I, i.e., the Massachusetts Civil Rights Act ("MCRA"). The MCRA provides a State remedy for interference or attempts to interfere with the exercise or enjoyment of rights secured by the Constitution or laws of the United States or rights secured by the Constitution or laws of the Commonwealth by threats, intimidation, or coercion. *See* MASS. GEN. LAWS ch. 12, § 11H. Section 11I authorizes a private cause of action for the deprivation of secured rights and an award of attorneys' fees for the prevailing party. *See* MASS. GEN. LAWS ch. 12, § 11I. Partelow's Verified Complaint fails to allege any interference with his rights by "threats, intimidation or coercion," a necessary predicate for recovery under the Massachusetts Civil Rights Act. *See Owens v. Dept. of Educ.*, 57 Mass. App. Ct. 1116 (2003) (attached). As such, the defendants are entitled to summary judgment on Partelow's claim that they violated G.L. c. 12, § 11I.

14

### 3. THE DEFENDANTS DID NOT VIOLATE PARTELOW'S FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. §§ 1981, 1983, 1985, 1986, OR 1988.

Counts VI and VII are pleaded under 42 U.S.C. §§ 1981, 1983, 1985(c), 1986, and 1988, and allege that the defendants violated Partelow's federal civil rights by their intentional, willful, knowing, malicious and purposeful violations. Partelow's claim that the defendants violated his civil rights guaranteed by federal law and the United States Constitution is without merit, as the defendants made a good faith effort to provide a reasonable accommodation for his disability at all times during his incarceration at the Hampden County Correctional Center.

### 4. PARTELOW FAILS TO STATE A CLAIM UNDER §1981.

Section 1981 guarantees equal rights under the law. *See* 42 U.S.C. § 1981. Kennedy does not claim that he is a member of a suspect class that is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562 (1976) (internal quotation marks omitted). Suspect classes for equal protection purposes include classifications based on race, alienage, or national origin, and certain quasi suspect classes, based on gender and illegitimacy. *See Int'l Paper Co. v. Town of Jay*, 928 F.2d 480, 485 n.2 (1st Cir. 1991). The Supreme Court indicated in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 441 (1985), that handicapped persons are not a suspect class. Several circuits have followed the Supreme Court's lead by holding that handicapped persons are not a suspect class for purposes of equal protection analysis. *See U.S. v. Harris*, 197 F.3d 870, 875-876 (7th Cir. 1999); *Hansen*

15

*v. Rimel*, 104 F.3d 189, 190 (8th Cir. 1997); *DeVargas v. Mason & Hanger-Silas Mason Co., Inc.*, 844 F.2d 714, 725 (10th Cir.1988); *Cal. Ass'n of the Physically Handicapped, Inc. v. FCC*, 721 F.2d 667, 670 (9th Cir.1983); *Brown v. Sibley*, 650 F.2d 760, 765-66 (5th Cir.1981). *Edward B. v. Paul*, 814 F.2d 52, 55-56 (1st Cir. 1987).

Although disabled individuals are protected by statutory enactments such as the ADA and the RA, they do not constitute a suspect class for purposes of equal protection analysis. As Partelow does not allege that he was denied access to handicapped accessible shower facilities because of his race or some other suspect classification, he has failed to state a cause of action under § 1981.

## 5. PARTELOW FAILS TO STATE A COGNIZABLE CLAIM UNDER § 1983.

The Court is without jurisdiction to entertain Partelow's claims under § 1983, because he requests only monetary damages and not injunctive relief. *See Wilson v. Brown*, 889 F.2d 1195, 1196 (1st Cir. 1989) (finding that prisoner who sought only monetary damages and not an injunction stated no claim under § 1983). In fact, Partelow has no cognizable claim against the defendants, whom he named in their official capacities. In *Will v. Mich. Dep't of State Police*, 485 U.S. 1005 (1989), the Supreme Court held that neither states, nor state officials acting in their official capacities, are "persons" within the meaning of § 1983. Thus, "a cause of action for damages against these parties will not lie." *Wilson*, 889 F.2d at 1197.

Accordingly, Partelow's § 1983 claim is without merit.

6. **EVEN IF PARTELOW STATED COGNIZABLE CLAIM UNDER § 1983, PARTELOW'S § 1983 AND § 1988 CLAIMS MUST BE DISMISSED, BECAUSE THERE IS NO EVIDENCE THAT THE DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE.**

In order for conditions of confinement to violate the Eighth Amendment's prohibition against cruel and unusual punishment, a plaintiff must demonstrate that the alleged deprivations denied him minimal civilized measure of life's necessities, and that the defendants were deliberately indifferent to an excessive risk to his health or safety. *See Seltzer-Bey v. Delo*, 66 F.3d 961, 963-64 (8th Cir. 1995); *see also Farmer v. Brennan*, 511 U.S. 825, 830 (1994). Deliberate indifference is manifested by conduct that offends evolving standards of decency. *See Estelle*, 429 U.S. at 106; *DesRosiers*, 949 F.2d at 18. Additionally, deliberate indifference is not inadvertent or negligent; "the complaint must prove that the defendants had a culpable state of mind and intended wantonly to inflict pain." *DesRosiers*, 949 F.2d at 19. "While this mental state can aptly be described as 'recklessness,' it is not recklessness in the tort-law sense, but in the appreciably stricter criminal-law sense, requiring actual knowledge of impending harm, easily preventable." *Id.* at 19.

In the context of this action, deliberate indifference means that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 834. A prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

17

*Farmer*, 511 U.S. at 837. Even if prison officials know of a substantial risk to inmate health or safety but fail to prevent the harm, they "may be found free from liability if they respond reasonably to the risk." *Giroux v. Somerset County*, 178 F.3d 28, 32 (1st Cir. 1999).

In the case of incarcerated prisoners with serious medical needs, failures to act, such as to provide medical care, may comprise a constitutional violation under §1983 only if the plaintiff shows that the inaction was malicious or reflected the official's deliberate indifference to the welfare of the prisoner or inmate. *See* U.S. CONST., amend. XIV; 42 U.S.C. §1983; *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999). Even if prison officials know of a substantial risk to inmate health or safety but fail to prevent the harm, they "may be found free from liability if they respond reasonably to the risk." *Giroux V. Somerset County* 178 F.3d 28, 32 (1st Cir. 1999). In the case of incarcerated prisoners with serious medical needs, failures to act, such as to provide medical care may comprise a constitutional violation under § 1983 only if the plaintiff shows that the inaction was malicious or reflected the official's deliberate indifference to the welfare of the prisoner or inmate. U.S. CONST. amend. 14; 42 U.S.C.A.§ 1983;

Here, none of the defendants' actions were deliberately indifferent as a matter of law. Immediately upon learning that Partelow requested an accommodation while the showers in his housing unit were being renovated, the defendants provided him with a chair to use in the shower. When Partelow complained that the shower chair was unacceptable, he was moved to a different housing unit that had handicapped accessible showers available. And when he protested to the restrictions placed upon him in the new housing unit, he was