UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NUMBER: 03-30294-MAP

WARREN PARTELOW,
PLAINTIFF

V.

COMMONWEALTH OF MASSACHUSETTS,
HAMPDEN COUNTY CORRECTIONAL CENTER,
MICHAEL ASHE JR., SHERIFF OF HAMPDEN COUNTY;
THOMAS CONKLIN, SUPERINTENDENT OF HEALTH SERVICES OF
HAMPDEN COUNTY CORRECTIONAL CENTER, CPT. WALKER,
CPT. SADDI, AND CERTAIN JOHN DOES,
DEFENDANTS

**DOCKETED**

### DEFENDANTS' REPLY TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT.

Now come the Defendants in the above-captioned matter, and reply herein to the Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and Request for Oral Argument. Plaintiff Partelow references the deposition testimony of his expert witness, Dr. Charles Newman, in support of his claim that the defendants discriminated against him in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., the Rehabilitation Act (RA), 29 USC. §§ 706, 791 - 794, Massachusetts General Law chapter 272, § 98, and Article 114 of the Amendments to the Massachusetts Constitution. The defendants bring the court's attention to several portions of Dr. Newman's testimony that Partelow failed to cite and which make clear that his so-called expert testiomny fails to raise a material issue of fact for trial.

Despite the fact that Dr. Newman has never visited the Hampden County Correctional Center and he does not know the age or capacity of the facility, he

17

concluded that the accommodations offered by the defendants were "incorrect." See Deposition of Charles L. Newman Tr. 90:24. The accommodations made for Partelow that Dr. Newman testified in conclusory fashion that these accommodations were "insufficient" included providing him a chair to use in the shower, giving him a wheelchair while he was in the facility, assigning him to a handicapped accessible cell, allowing him to use the elevator, transferring him out of C Tower upon his request, and allowing him to shower in the Medical Department. See Deposition of Charles L. Newman Tr. 91:3 to 92:19. Indeed, Defendants' counsel concluded that particular line of questioning as follows:

> Q: Would you agree that all those were at least attempts to accommodate his handicap?
>
> A: Oh, I think that they are attempts; yes.

See Deposition of Charles L. Newman Tr. 92:17-19.

The period during which Partelow was incarcerated at HCCC coincided with renovations to the facility's showers. Due to the renovations, a handicapped accessible shower was not always available in the housing unit to which Partelow was assigned. Accordingly, the defendants offered the aforementioned reasonable accommodations. During his deposition, Dr. Newman acknowledged that "it is a very good thing" to renovate the showers at the facility, and that such renovations are "going to cause a certain amount of inconvenience to the handicapped individuals." See Deposition of Charles L. Newman Tr. 76:10-19. In fact, Dr. Newman stated that "[r]etrofitting a prison is not a simple task." See id. Tr. 79:13-14. Accordingly, the

fact that Partelow experienced some inconvenience with respect to the shower facilities is not tantamount to a violation of state or federal law.

The defendants clearly made a good faith effort to accommodate Partelow's disability while he was incarcerated at HCCC. For the reasons stated herein and in the defendants' Motion for Summary Judgment, the defendants' Motion for Summary Judgment should be granted.

For the Defendants by their Attorneys

_____
Edward J. McDonough, Jr., BBO# 331590
Katherine A. Day, BBO# 657765
EGAN, FLANAGAN AND COHEN, P.C.
67 Market Street - Post Office Box 9035
Springfield, MA 01102
(413) 737-0260; Fax: (413) 737-0121

Certificate of Service

_____ certifies that copies of the foregoing document was served on all parties by fax/mail on 9/22/2005.

0056-030351\98432.wpd

IN THE MATTER OF:

WARREN PARTELOW vs. COMMONWEALTH OF MASS. ET AL

DEPOSITION OF:

CHARLES L. NEWMAN
DATE:  MARCH 23, 2005

**PERLIK and COYLE REPORTING**
*Certified Professional Reporters*

*1331 Main Street*
*Springfield, MA 01103*
*Tel.(413) 731-7931   Fax(413) 731-7451*

**COMPRESSED TRANSCRIPT & WORD INDEX**

Case 3:03-cv-30294-MAP    Document 17-3    Filed 09/22/2005    Page 5 of 17

WARREN PARTELOW vs. COMMONWEALTH OF MASSACHUSETTS ET ALS
CHARLES L. NEWMAN                    MARCH 23, 2005

Case 3:03-cv-30294-MAP   Document 17-3   Filed 09/22/2005   Page 6 of 17

---

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 03-30294-MAP
Pages 1-95

WARREN PARTELOW

vs.

COMMONWEALTH OF MASSACHUSETTS ET ALS

---

TELEPHONIC DEPOSITION OF: CHARLES L. NEWMAN
---

Taken before Joanne Coyle, Certified Shorthand Reporter, Notary Public, pursuant to the Federal Rules of Civil Procedure, at the offices of Egan, Flanagan and Cohen, P.C., 67 Market Street, Springfield, Massachusetts on MARCH 23, 2005, commencing at 11:10 a.m.

Joanne Coyle
Certified Shorthand Reporter
License No. 106693

**PERLIK and COYLE REPORTING**
Certified Professional Reporters

1331 Main Street
Springfield, MA 01103
Tel. (413) 731-7931   Fax (413) 731-7451

---

**Page 2**

APPEARANCES:

FOR THE PLAINTIFF:

   LAW OFFICE OF ALFRED P. CHAMBERLAND
   9 Campus Lane
   Easthampton, Massachusetts 01027
   BY: RICHARD HABHAB, ESQUIRE and
   ALFRED P. CHAMBERLAND, ESQUIRE

FOR THE DEFENDANTS:

   EGAN, FLANAGAN AND COHEN, P.C.
   67 Market Street
   Springfield, Massachusetts 01103
   BY: EDWARD J. McDONOUGH, JR., ESQUIRE

---

**Page 3**

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHARLES L. NEWMAN | 5 | | | |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 6 |
| 2 | Preliminary Report | 8 |
| 3 | 3/8/05 Report | 10 |
| 4 | TASA Group Invoices | 12 |
| 5 | Professional Resume | 13 |
| 6 | Closed Cases 1995-2004 | 15 |
| 7 | Document Re Issues Addressed | 65 |

---

**Page 4**

STIPULATIONS

It is agreed by and between the parties that all objections, except objections as to the form of the question, are reserved to be raised at the time of trial for the first time.

It is further agreed by and between the parties that all motions to strike unresponsive answers are also reserved to be raised at the time of trial for the first time.

It is further agreed that the deponent will read and sign the deposition and that the sealing of said deposition will be waived.

It is further agreed by and between the parties that notification to all parties of the receipt of the original deposition transcript is also hereby waived.

*****

**Page 5**

1    CHARLES L. NEWMAN, the Deponent, having
2  been satisfactorily identified by counsel and
3  having been first duly sworn by the Notary Public,
4  deposes and says as follows:
5          MR. McDONOUGH: Usual stipulations,
6  and Doctor, we're going to ask you to read and
7  sign this transcript, is that okay with you?
8          THE WITNESS: Yes.
9                    * * * * *
10       DIRECT EXAMINATION BY MR. McDONOUGH
11   Q.   Doctor, let me reintroduce myself. My
12  name is Ed McDonough. I represent the defendants
13  in this case that's been brought by Warren
14  Partelow.
15       You have been designated as an expert
16  witness for Mr. Partelow, is that correct?
17   A.   That is correct.
18   Q.   With this notice, Doctor, we asked that
19  you provide certain documents, if, indeed, you
20  have them. Do you have that notice handy?
21   A.   I don't have the notice but I do have
22  the documents that were requested.
23          MR. McDONOUGH: We have marked as
24  the first exhibit the actual notice and when you

**Page 6**

1  get the transcript to review, you will get a copy
2  of all of the exhibits, of course.
3          THE WITNESS: Of course.
4          (Defendant's Deposition Exhibit
             No. 1 offered and marked.)
5
6    Q.   (BY MR. McDONOUGH) Let me just, if I
7  could, go through the Schedule A that we asked for
8  production.
9        Number one is all reports prepared in
10  connection with the claim. Do you have a report,
11  sir?
12   A.   Yes, sir.
13   Q.   Is that the same report that's dated
14  February 15th, 2005?
15   A.   Yes; that was labeled a preliminary
16  report. I subsequently sent a final report
17  sometime early in March. It was the same report,
18  basically.
19          MR. McDONOUGH: I do not believe I
20  have that. I'm quite sure that I don't.
21          Richard, do you have anything called a
22  final report?
23          MR. HABHAB: Can I see that? What's
24  the date on the final report?

**Page 7**

1          THE WITNESS: I don't recall. It
2  was somewhere in the first week or so in March.
3  I've got it on my computer but I don't have hard
4  copy here in front of me.
5          MR. HABHAB: Did you send one to
6  Mr. Chamberland?
7          THE WITNESS: Yes.
8    Q.   (BY MR. McDONOUGH) By any chance, do you
9  have access to a fax machine?
10   A.   I can fax it to you when we finish.
11   Q.   Do you have e-mail that's independent of
12  this phone line?
13   A.   No, sir.
14   Q.   Doctor, do you believe the report is the
15  same?
16   A.   Yes.
17   Q.   Are you able to print it out?
18   A.   Well, I'd have to -- well, yes, I'm able
19  to print it out but I'm not able to transmit it to
20  you while I'm on this line.
21   Q.   Do you have in front of you your
22  preliminary report dated February 15th?
23   A.   Yes.
24   Q.   You don't have in front of you the March

**Page 8**

1  report?
2    A.   No, sir, because there was really no
3  change in it except for the date.
4    Q.   I don't doubt your memory on that one
5  bit. I'm just worried that if your memory is as
6  bad as mine -- wait a minute.
7    A.   What it did was change the date and took
8  out the word "preliminary."
9    Q.   I appreciate that, Doctor, and I think
10  you're right.
11       I'm going to hand this to my paralegal
12  and have her make photocopies of it so we can go
13  on with the deposition, okay?
14   A.   That's fine.
15          (Pause in proceedings.)
16          MR. McDONOUGH: Doctor, I'm back.
17  Doctor, we have marked as Exhibit 2 the
18  preliminary report dated February 15th.
19          (Defendant's Deposition Exhibit
             No. 2 offered and marked.)
20
21   Q.   (BY MR. McDONOUGH) We're about to mark
22  as Exhibit 3, as soon as we have it, the final
23  report, but you've indicated to me that your
24  understanding is the only difference between the

Page 9

1 preliminary and the final are the date and that
2 you've taken the word preliminary out of the
3 title?
4    A.  That is correct.
5    Q.  Let's move on, then. Doctor, we had
6 asked that you produce or your counsel produce any
7 letters of engagement -- engagement letters. Do
8 you have such a letter?
9    A.  I had a phone call to that effect.
10    Q.  But no letter?
11    A.  No letter; no.
12    Q.  Does your file have any letters from
13 counsel other than, let's say, enclosure letters?
14    A.  No.
15    Q.  Do you have your notes?
16    A.  Yes.
17    Q.  Are those handwritten notes?
18    A.  Very brief notes; yes. Basically what I
19 do is I go through a file, highlight the items
20 that are important and I red tab them, rather than
21 write all what I see as critical elements out in
22 detail in a case notes file.
23    Q.  Do you have your notes with you, today?
24    A.  Well, to the extent that they exist;

Page 10

1 yes.
2    Q.  I would ask you to preserve those,
3 Doctor. Would you agree to do that?
4    A.  Yes.
5    Q.  Any notes you would take on this case
6 from today forward, would you keep those, also,
7 separate?
8    A.  Yes, sir.
9    Q.  The report -- your final report -- dated
10 March, Doctor, does that in fact contain all of
11 the conclusions and opinions that you've arrived
12 at in this case?
13    A.  Yes, sir.
14    Q.  Do you have any plans to do any more
15 work on this case, Doctor?
16    A.  Not unless I'm asked.
17        MR. McDONOUGH:  Now we have -- I'm
18 going to return the original to counsel and I'm
19 going to ask the court reporter to mark your
20 March 8th, 2005 report as the next exhibit in the
21 interest of completeness.
22        (Defendant's Deposition Exhibit
          No. 3 offered and marked.)
23
24    Q.  (BY MR. McDONOUGH) Doctor, just moving

Page 11

1 along, we had asked, paragraph four of the Notice,
2 for all records of payment.
3        Your counsel has produced three invoices
4 from the TASA Group. Does that sound familiar to
5 you?
6    A.  That's correct.
7    Q.  Do you have three, as well?
8    A.  Yes, sir.
9    Q.  The most recent one is for the telephone
10 deposition, which obviously is a reference to
11 today, is that correct?
12    A.  Correct.
13    Q.  And that is four hours, is that correct?
14    A.  That is correct.
15    Q.  And your rate is four hundred dollars an
16 hour?
17    A.  That is correct.
18    Q.  For the deposition testimony?
19    A.  That is correct.
20    Q.  And your rate appears to be three
21 hundred dollars an hour for everything else?
22    A.  That is correct.
23    Q.  It appears -- do these three bills
24 constitute records of all the times you've worked

Page 12

1 on this case?
2    A.  That is correct.
3    Q.  On February 16th -- excuse me, I've got
4 them backwards.
5        There's a bill dated February 17th for
6 one hour and that says for preparation of
7 deposition?
8    A.  That is correct.
9    Q.  Then there is another bill dated
10 February 24th for teleconferences, review and
11 preparation of report, is that correct?
12    A.  That is correct.
13    Q.  Those services were rendered on
14 February 16th, 2005?
15    A.  I believe that to be correct.
16        MR. McDONOUGH:  I'm going to ask the
17 court reporter to mark all three of these TASA
18 invoices as one exhibit.
19        (Defendant's Deposition Exhibit
          No. 4 offered and marked.)
20
21    Q.  (BY MR. McDONOUGH) Moving on, Doctor,
22 in reference to Schedule A, the fifth paragraph
23 asked you to produce all publications authored by
24 the witness and I understand that you've authored

Case 8:03-cv-30284-MAP   Document 73   Filed 09/22/2005   Page 9 of 17

WARREN PARTELOW vs. COMMONWEALTH OF MASSACHUSETTS ET ALS
CHARLES L. NEWMAN                              MARCH 23, 2005

Page 13

1  a large number of things, is that correct?
2      A.   That's correct.
3      Q.   What I'm going to do, Doctor --
4      A.   (Interposing) I'm having difficulty
5  hearing you. You moved away from me.
6      Q.   Yes; I did. I apologize. What we have,
7  Doctor, is your -- it's entitled Professional
8  Resumé?
9      A.   That's correct.
10     Q.   The version that I have -- I would
11 expect that you update this from time to time?
12     A.   Yes, sir.
13     Q.   The one I have has a date in the
14 left-hand side of 01/05?
15     A.   That's probably correct; yes.
16     Q.   Let me have the court reporter mark that
17 as an exhibit -- and attached to that appears to
18 be a list of your technical assistance reports and
19 articles?
20     A.   And books.
21     Q.   And books; thank you.
22          (Defendant's Deposition Exhibit
            No. 5 offered and marked.)
23
24     Q.   (BY MR. McDONOUGH) We've mark that as

Page 14

1  Exhibit 5.
2          While we're on that, Doctor, you have
3  provided something, a two-page document called
4  "Closed Cases 1995 to 2004," does that sound
5  right?
6      A.   That is correct.
7      Q.   Just curious, Doctor, do you have any
8  other open cases?
9      A.   I have one other open case with
10 Mr. Chamberland and two that TASA referred to me
11 that I have no action on at this point.
12     Q.   Before I forget, if I could just
13 generally ask you about the other case with
14 Mr. Chamberland -- what does that involve?
15     A.   That involves a problem in the jail.
16     Q.   Which jail?
17     A.   I believe it's the same jail we're
18 talking about here.
19     Q.   Without -- I don't intend to go very far
20 with this, Doctor, but can you generally give me
21 the subject matter?
22     A.   I have to go into the file to pull it
23 out so that I can abbreviate that.
24          MR. HABHAB: It's Kennedy.

Page 15

1      Q.   (BY MR. McDONOUGH) Counsel has indicated
2  it's a case brought by Mr. Kennedy which is
3  familiar to me. I'm defending that case as well.
4      A.   Okay.
5      Q.   Does that ring a bell with you --
6  Kennedy?
7      A.   Yes; well I recall now that Kennedy had
8  apparently some problems getting in and out of a
9  bed in the housing unit since he was on the upper
10 bunk.
11     Q.   Obviously, you haven't given any
12 testimony in that case, correct?
13     A.   I've given no report, either.
14     Q.   Thank you. Let me just jump back to the
15 closed case list. Do you have it in front of you?
16     A.   Yes.
17     Q.   Just so we're looking at the same
18 version, the second page, the last case is Taylor
19 Jones, Junior, is that right?
20     A.   That is correct.
21          MR. McDONOUGH: I'm going to ask the
22 court reporter to mark this as the next exhibit.
23          (Defendant's Deposition Exhibit
            No. 6 offered and marked.)
24

Page 16

1      Q.   (BY MR. McDONOUGH) We've marked the
2  Closed Cases, 1995 to 2004 as Exhibit 6, Doctor.
3          While I have it in my hand, I'm having
4  trouble figuring out which side you were on in
5  these cases, Doctor?
6      A.   When you look at the attorney, if you
7  look at the first listing, Susan Boresi, you'll
8  notice in parenthesis there's a D, which means I
9  was providing services to the defendant, which in
10 this instance was the State of Missouri.
11     Q.   Thank you, Doctor. I should have been
12 able to figure that one out, myself.
13     A.   What it tells me is I'm going to have to
14 put in another coding item.
15     Q.   I don't think you should have to do
16 anything, actually, now that I know.
17     A.   Okay.
18     Q.   Doctor, I do not intend to take you
19 through, you'll be happy to know, each of these
20 cases, but none of these cases appear to involve a
21 claim of handicap discrimination, is that correct?
22     A.   That is correct.
23     Q.   So none of these cases would involve
24 more specifically a claim under the Americans with

**17**

1  Disabilities Act, is that correct?
2  A. That is correct.
3  Q. Thank you. I'm going to move on.
4  Getting back to Schedule A, you were asked to
5  produce all standards, regulations, ordinances or
6  laws relied upon or used by you, the witness, and
7  do you have any such thing?
8  A. I indicated in my submission that I had
9  used the portions of the Americans with
10 Disabilities Act for reference. Beyond that, no
11 laws particularly.
12 Q. And no regulations?
13 A. No, sir.
14 Q. And no written standards?
15 A. No, sir.
16 Q. Do you have the portions of the ADA that
17 you relied on with you in your file?
18 A. I identify them in my report. I do not
19 have printout copies of them.
20     The ADA report is an extremely long one,
21 as you know, and I picked out several sections
22 that I thought were appropriate in these
23 findings.
24 Q. Did you work right out of the book,

**18**

1  Doctor?
2  A. I pulled them up on the Net.
3  Q. Did you print them out?
4  A. No; I did not.
5  Q. And you don't have them with you, today?
6  A. No, sir.
7  Q. Let me move on, then. The next category
8  of documents is all treatises, articles, and any
9  other publications used or relied on by the
10 witness.
11     Do I understand correctly that there are
12 no such documents?
13 A. No such documents.
14 Q. Thank you. I'll move on. I think
15 you've given us this one already -- any list of
16 firms or individuals which have retained you as a
17 consultant. Would that be the Closed Case list?
18 A. Well certainly in terms of litigation.
19 In order to clarify, most of the work that I do is
20 working with units of government -- county, state,
21 municipal, working with problems on jails, not
22 necessarily litigation involving individuals but
23 in terms of jail conditions, prison conditions and
24 so forth.

**19**

1     My role generally is not in an adversary
2  sense. I come in when I'm asked to help them
3  straighten out a problem, rather than to assume
4  who is responsible or not responsible.
5  Q. Thank you, Doctor. I gathered some of
6  that from your extensive resumé.
7     Could I just ask you some questions
8  about that type of work?
9  A. Yes.
10 Q. Have you ever been retained by any jail
11 or prison in Massachusetts?
12 A. No, sir.
13 Q. How about New England?
14 A. Oh, my goodness. I've been doing this
15 now for almost forty years. I'm trying to recall.
16     When you say New England -- I did some
17 work up in Rhode Island for the Rhode Island
18 Department of Corrections in regard to funding
19 that they had for Law Enforcement Assistance
20 Administration to see that LEAA was getting what
21 they provided funds for.
22 Q. Can you think of any other project that
23 you worked on in New England?
24 A. I'm trying to run this through my memory

**20**

1  bank. Not that I can recall at this point. If
2  something comes up, I'll let you know.
3  Q. Doctor, when you read this deposition
4  transcript, you'll have what we call an errata
5  sheet.
6  A. Yes.
7  Q. If your memory is refreshed, you can
8  certainly add anything that comes to mind on that
9  errata sheet?
10 A. Yes, sir.
11 Q. Let me move on, Doctor. In a
12 non-adversary role, have you ever been consulted
13 for an Americans with Disabilities Act other than
14 this case?
15 A. No, sir.
16 Q. Have you ever been brought in as a
17 consultant on any issue involving handicap access?
18 A. In terms of litigation or in terms of
19 working with counties to provide adequate
20 facilities? Which is your question.
21 Q. I think you've already told me you have
22 not had any litigation consulting in the area of
23 handicap, is that correct?
24 A. That is correct.

**21**

Q. I appreciate the clarification. Have you been retained by any jail or prison to specifically advise them on compliance with any handicapped regulations and laws?

A. I have prior to ADA and I think we've used that in part of our consultation protocol to -- when we're designing -- working on a design or construction of new jails that they meet all ADA standards in terms of handicap resources.

That would not be a report. That would be something that the architect would have incorporated into his design.

Q. Is it correct that architects are required to design jails consistent with the ADA?

A. That is correct.

Q. So that wouldn't be your at least immediate function, it would be the architect's, wouldn't it?

A. It would be the architect's, but architects design buildings. They do it in terms of standards of construction standards, stuff like that and sometimes handicapped facilities kind of get lost in the process and that is explained to them.

**22**

For example, I've been working with one architect specifically for probably about twelve to fourteen years. We worked out a protocol to make sure that there are a handicapped facilities in each housing unit. That is a wheelchair compatible size cell.

We scan -- when the architect gets through with his drawings, I'm given the opportunity to review it to see a variety of different issues but handicapped is one of them -- and that is that the showers are handicapped equipped in terms of grab bars, seats, and so forth.

In the handicapped cells that they have, the individuals are not required to climb up to an upper bunk; that there's more room for a turning radius for a wheelchair and items such as this, but this is something we've been doing long before ADA. It's a matter of practicality.

Q. Who is the architect that you referred to?

A. Morris Goldberg.

Q. What state does he work out of?

A. Missouri.

**23**

Q. He's an architect, you say?

A. He is an architect; yes.

Q. You have worked with Mr. Goldberg in making suggestions on jail design?

A. Well, we have worked out an arrangement where, number one, we talk about -- I generally do a needs assessment for him essentially for the client to decide what the actual needs are for the particular county because there's a tendency to, A, overbuild, or, B, underbuild; and the attempt to make some kind of projections so the county will have adequate space within five, ten, fifteen years forward.

Q. You called it a protocol, Doctor?

A. Well, protocol in the sense that we have a routine that we follow in evaluating what space is going to be needed in terms of cells, what kind of space is going to be needed in ancillary resources such as kitchen, laundry, recreation space, educational space, a library and if the facility is large enough, there are other things that are cranked into this process.

Most of the jails that I've worked with Mr. Goldberg over the years have tended to be

**24**

small jails, under a hundred, a hundred twenty-five.

Q. If I may, did you finish?

A. I'm sorry?

Q. Did you finish?

A. Yes.

Q. How many jails did you consult on with Mr. Goldberg?

A. Probably somewhere around seventy-five. Not all of those jails were ultimately built but we did consultation in terms of needs assessment and presenting it to the county.

Q. How many do you believe were actually built?

A. Probably somewhere around thirty to forty.

Q. Did you visit each such jail?

A. I did at some point during the construction or at the -- what they call the punch list, the final review to make sure that everything that should have been done by the contractor was done.

Q. This protocol that you've referred to, is this a document that you created?

**Page 25**

Q. We did it jointly.
Q. Does it have specific mention of the ADA and handicapped requirements?
A. No, sir; it does not.
Q. Do you have a copy?
A. No; I do not.
Q. Is there a reason you don't?
A. Well, I haven't been doing this for a couple of years. I'm getting pretty old to travel all over the country.
Q. When would be the last time that you used this protocol to advise an architect about suitability of jail design?
A. I'd say about two and a half years ago.
Q. Do you have any way of obtaining a copy of that protocol?
A. Oh, sure.
Q. Would you agree to do that?
A. Yes.
Q. But your testimony today is that it does not have any specific reference to handicapped compliance, is that correct?
A. I'm trying to think through the form because, as I said, it's been a long time since

**Page 26**

I've worked with it.
It will not mention ADA specifically but probably in all likelihood it would have mentioned the fact that there were certain needs for handicapped persons.
Q. Let me move on. The next document category that was requested was all photographs relied on or taken by the witness in connection with this claim.
Do I understand correctly that you, yourself, did not take any photographs?
A. That is correct.
Q. Did you rely on any photographs?
A. No, sir. Let me add that there were photographs provided to me in the packet of discovery documents but it seems to me that these were ex post facto -- that is they were taken subsequent to the time that Mr. Partelow was in the jail.
Q. Did those photographs appear to you to be post renovation photographs?
A. Yes.
Q. Did you observe any aspect -- strike that.

**Page 27**

These were photographs, were they not of the showers?
A. That is correct.
Q. Did they appear --
A. (Interposing) Excuse me; they were of the showers and also of the layout of the day room and the layout of the closed cell doors.
Q. Again, your understanding was that these were post renovation, correct?
A. That that is correct.
Q. In terms of what you observed of those showers in those photographs, did you have any criticisms of the handicap showers post renovation?
A. I didn't feel I was competent to comment based on looking at a photograph.
I would have to have seen them to see just whether they were functional from the standpoint of meeting the needs of the handicapped.
Q. At least from looking at the copies of those photographs of those showers, you have not formed any critical conclusions, correct?
A. Correct; nor was I asked to.

**Page 28**

Q. The last category was all files maintained by you in connection with this claim. Do you have a file?
A. Yes.
Q. I'm going to guess it's in some kind of a folder?
A. It's on the computer at this point.
Q. Would you agree to preserve that in the event you have to testify at trial?
A. Yes.
Q. Would you agree to print out your file from the computer and return it with the signed copy of the deposition?
MR. HABHAB: Objection.
THE WITNESS: Yes.
Q. (BY MR. McDONOUGH) You would agree?
A. Yes.
Q. Thank you.
MR. HABHAB: Off the record.
(Discussion off the record.)
Q. (BY MR. McDONOUGH) Back on the record, Doctor. Just sticking with your file before I move on, I would like you to tell me what you have in your file.

### Page 29

1   You've already indicated that you have
2 stuff on computer, correct?
3   A.   I have some notes on computer, but very,
4 very few. As I indicated to you earlier, I
5 highlight the sections of the material that have
6 been provided to me and tab them with stick-um
7 type tabs and then I go through physically and
8 pull out materials.
9       I've done a great deal of this so I'm
10 able to retain a great deal without writing it
11 down.
12   Q.   Thank you. You have photographs, you
13 said -- or copies of photographs, correct?
14   A.   That is correct.
15   Q.   You have your handwritten notes, is that
16 correct?
17   A.   That is correct.
18   Q.   What else do you have, Doctor?
19   A.   That's about it. I have copies of
20 pleadings, I have medical records. I have
21 everything, essentially, I think that Plaintiff's
22 counsel provided me.
23       I suspect he provided you with a list of
24 those items.

### Page 30

1   Q.   Do you have the deposition of the
2 Plaintiff?
3   A.   No; I do not.
4   Q.   Do you have the Defendant's Answers to
5 Interrogatories?
6   A.   Yes.
7   Q.   When you say you had the Plaintiff's
8 medical records, you do have those?
9   A.   Yes, sir.
10   Q.   Do you have his medical records from the
11 Hampden County Correctional Center?
12   A.   I think they are integrated into the
13 general file; yes.
14   Q.   I'm not going to go through those with
15 you, but I do need to verify that you have them,
16 Doctor.
17       Could you locate, if you have them, the
18 medical records of the Hampden County Correctional
19 Center -- and I will represent to you that they
20 are about an inch thick and the pages are
21 Bate-stamped numbered, if that will help you?
22   A.   I've got something that, for example, I
23 just pulled these out randomly out of the box, on
24 the twelfth of January, he had a wellness check,

### Page 31

1 on the thirteenth, he had a nursing clinic visit.
2   Q.   Can I just interrupt you, Doctor,
3 because I maybe can shorten this.
4       The page or pages that you're looking
5 at, if you look in the lower right-hand corner, is
6 there a number?
7   A.   No; they are not.
8   Q.   What's the date that you said he had a
9 wellness check?
10   A.   The thirteenth of January.
11   Q.   What year, please?
12   A.   Pardon me?
13   Q.   What year, please?
14   A.   2001.
15   Q.   Are those typed notes?
16   A.   They look like they're a computer
17 printout; yes. If this will help you any, it's on
18 a regular printout sheet.
19       It lists his name, his booking number,
20 the date, the time he was seen, who he was seen
21 by, the type of encounter.
22   Q.   That's it, Doctor, thank you. I believe
23 you have what I am asking you about. Thank you.
24       Doctor, do you have anything else in

### Page 32

1 your file that you have not either been asked
2 about or mentioned?
3   A.   I have some detailed hospital notes,
4 some going back I think before the current
5 incarceration but as I said, I got a whole packet
6 of materials, it's about four inches thick of
7 various medical records and I think some of them
8 go back to previous incarcerations, but for the
9 record, I'll say that I did not feel I was
10 qualified to evaluate those as I am not a
11 physician.
12   Q.   I appreciate that. Other than medical
13 records, Doctor, do you have anything else that
14 you haven't already mentioned?
15   A.   No, sir. I don't know whether I
16 mentioned incident forms but those were included
17 as part of the record. That was a series of
18 incident forms that were written up by various
19 officers of the Hampden County Jail and House of
20 Corrections.
21       I have some forms related to a
22 Segregation Admission Log and some grievance forms
23 and then Inmate Request Forms making a request to
24 Sheriff Ashe. There are a whole series of these

Page 33

1 and I just pulled some out at random.
2   Q.  I think we can cover this quickly. You
3 have an Inmate Request Form to the sheriff. Is
4 that dated 1/9/01?
5   A.  Yes.
6   Q.  What other -- you said you had a
7 grievance form. Would you locate that, please?
8   A.  Yes; sure. Off the record.
9       (Discussion off the record.)
10      THE WITNESS: The grievance form,
11 which I just dropped, is dated 2/06/01.
12  Q.  (BY MR. McDONOUGH) Does that, at the
13 bottom, have a staff response filled in?
14  A.  Yes; it does.
15  Q.  Is that dated 2/8/01?
16  A.  Yes; that's correct.
17  Q.  Do you have any documents entitled
18 Incident Report Form?
19  A.  Yes.
20  Q.  Could you identify the date?
21  A.  I have one dated 3/12/01.
22  Q.  That says Incident Report on it?
23  A.  Yes; it does. It's a report form.
24  Q.  Are you able to tell me, without reading

Page 34

1 the whole thing to me, generally the subject
2 matter of it?
3   A.  He's apparently said he was allergic to
4 eggs and that's an order from medical, I assume,
5 to substitute something when eggs are served,
6 signed by Virginia Carpenter, RN.
7   Q.  Do you have any other Incident Reports?
8   A.  There's a whole series of them. There's
9 one dated 2/14/01.
10  Q.  What is that about, Doctor?
11  A.  It asked Virginia Carpenter -- again
12 asks that Partelow be allowed to use crutches for
13 medical reasons until 3/14/01.
14      I mentioned the grievance form. There's
15 a report dated 1/21/01, again by Karen Williams,
16 RN, saying that he can have cereal in place of
17 eggs, that he's allergic to eggs.
18  Q.  Any others, Doctor?
19  A.  As I said, there's a whole bunch of
20 them.
21      There's one dated -- 1 -- I can't make
22 out if it's 1/10 or 1/18, it has LT left
23 prothesis. I don't know what the abbreviation is
24 and it's signed by Patricia, RN, also approved by

Page 35

1 the supervisor.
2   Q.  I see that one, Doctor.
3   A.  Pardon me?
4   Q.  I do see that one, Doctor. Maybe if I
5 can save time, Doctor, do you have any Incident
6 Reports that pertain to any complaint about the
7 showers?
8   A.  Yes.
9   Q.  Could you locate that, please?
10  A.  I have one dated -- I'm sorry, this is
11 1999; sorry.
12      Okay; I have one dated, Segregation
13 Admission Log Sheet of -- dated 1/10/01 where
14 he -- Mr. Partelow was moved to C-3 with all C-3
15 privileges due to handicapped accessibility in
16 showers.
17  Q.  Okay.
18  A.  I have one, a grievance which I
19 mentioned earlier which you have in the file. I
20 have an Inmate Request to Sheriff Ashe for
21 handrails in shower stalls to have something to
22 hold on to, which there was no response,
23 apparently.
24      That's a report dated 1/10 signed by

Page 36

1 Captain Murphy in which he met with the inmate
2 regarding an issue he had with inmate showers in
3 Davis 1. I assume that's D-1.
4   Q.  Yes; it is. Just so we're clear on that
5 one, is that the one by Captain Murphy, is that
6 dated January 10th, '01 and is there a six-
7 fifteen p.m. time on it?
8   A.  Yes; that's correct.
9   Q.  We have that one. Thank you.
10  A.  I have a grievance form -- some of these
11 things appear duplicative.
12      There is one of those medical documents
13 dated 5/03/2000. I think this may be before this
14 case, is that correct?
15  Q.  Yes.
16  A.  Okay.
17  Q.  Doctor?
18  A.  Yes.
19  Q.  You have located the ones that I was
20 interested in.
21      I don't want to move on unless there's
22 any other Incident Report pertaining to the
23 showers that you have located?
24  A.  At the moment, that's the only ones that

**Page 37**

1 I can recall having read.
2 Q. I think, with your permission, I'm going
3 to go on?
4 A. Yes; absolutely.
5 Q. Doctor, do you know who Thomas Conklin
6 is?
7 A. No; I do not.
8 Q. Do you know who Captain Saddi is?
9 A. Only by name in the record.
10 Q. What's your understanding of who Captain
11 Saddi is?
12 A. Captain Saddi was apparently -- is a
13 tower or unit commander. The word "towers" is
14 used. Since I have not seen the facility, I'm not
15 sure what it refers to, but it could be a
16 multi-floor unit.
17        In any case, he was the unit commander
18 at one point when Mr. Partelow was either housed
19 there or Mr. Partelow had made a verbal request of
20 him for something.
21 Q. Is it correct that -- strike that. Let
22 me move on. Do you know who Captain Walker is?
23 A. I'm sorry?
24 Q. Do you know who Captain Walker is --

**Page 38**

1 W-A-L-K-E-R?
2 A. Well, again, from an Incident Report, I
3 assume he is a unit or tower commander. Again,
4 where he fits in, in the organization, I'm not
5 quite sure I know.
6 Q. Do you know who John Kenney is?
7 A. No; I do not.
8 Q. Do you know who Kathy Wyler is?
9 A. No.
10 Q. Do you know who Robin Powell is?
11 A. No; I do not.
12 Q. Do you know who Jack Dineen is?
13 A. No.
14 Q. Those people that you did not know, I
15 assume you have not formed any criticisms of their
16 conduct in this case, is that correct?
17 A. That is correct.
18 Q. Let me move on. I think you just said
19 you have never been to this facility, correct?
20 A. That is correct.
21 Q. Where is it located, Doctor?
22 A. Again, I'm not quite sure I know a
23 specific location of the facility but -- would
24 Holyoke be a good guess?

**Page 39**

1 Q. Let me move on. Do you know if it's in
2 western or eastern Massachusetts?
3 A. I would assume that it's probably
4 eastern Massachusetts.
5 Q. Do you know when it was built?
6 A. No; I do not.
7 Q. Do you know what its capacity is?
8 A. No; I do not.
9 Q. Do you have any idea of even the range
10 of the capacity?
11 A. No; I do not.
12    MR. HABHAB: Objection.
13 Q. (BY MR. McDONOUGH) Who is the sheriff
14 of Hampden County?
15 A. At least at this time, it was Mr. Ashe.
16 Q. What's his first name?
17 A. I don't think his first name was ever
18 given.
19 Q. How long has he been sheriff?
20 A. I do not know. The only thing I do know
21 is there was a letter -- a letter sent to Mr. Ashe
22 complaining about conditions and it was not
23 responded to.
24 Q. Who wrote that letter?

**Page 40**

1 A. Mr. Partelow.
2 Q. Your understanding is that the sheriff
3 never responded to Mr. Partelow?
4 A. At least the format that is used, it's
5 fairly common when someone sends a request on a
6 jail-established form asking for something or
7 asking for things to be changed, et cetera, in all
8 of the other requests, all the other grievances
9 and so forth, the response was put at the bottom
10 of the form. The form that I received had no
11 comment on it.
12 Q. Did the Sheriff ever meet with
13 Mr. Partelow?
14 A. I believe he did; yes.
15 Q. What is the basis of that, sir?
16 A. I do not recall. It may have been
17 something that was told me by Mr. Chamberland or
18 it may have been something I read. I don't
19 recall.
20 Q. Other than your memory -- well, I guess
21 you've -- can you identify anything in writing
22 that indicates to you that the Sheriff met with
23 Mr. Partelow?
24 A. At the moment, no. I will change that

### Page 41

1 in the errata sheet if I go back and discover
2 something.
3     Q.  Is it correct that you have not
4 expressed any criticisms of the Sheriff's personal
5 conduct in this case, is that correct?
6     A.  That is correct.
7     Q.  Is it correct that you have no
8 information as to the credentials or
9 qualifications of the Sheriff?
10    A.  No; I do not.
11    Q.  Of course -- well, I say of course.  I'm
12 assuming you are not an attorney?
13    A.  No; I am not.
14    Q.  Do you have any particular professional
15 training in the law?
16    A.  I've had courses in law school; yes.
17    Q.  What law school did you attend?
18    A.  I had attended some courses at the
19 University of North Dakota when I was on the
20 faculty there and I attended some courses at the
21 University of Louisville, when I was at the
22 faculty of the University of Louisville; and I was
23 an adjunct lecturer at the law school in relation
24 to my area of expertise.

### Page 42

1     Q.  What subjects did you lecture in as an
2 adjunct professor in the law school?
3     A.  In the family law program, talking about
4 the problems related to families dealing with
5 jails where one of the family members was
6 incarcerated.
7     Q.  Anything else?
8     A.  Again, this was back in the mid 1950's.
9 I'll have to admit while my memory is good, it
10 doesn't extend to the content of several lectures.
11    Q.  Thank you.  Are you able to -- when you
12 were at the University of North Dakota, you said
13 you took some law courses?
14    A.  I took a course in legal bibliography
15 and I believe I sat in on a course in criminal
16 law, but that was back in 1952.
17    Q.  Did you take any other law courses?
18    A.  No; I did not.
19    Q.  Have we exhausted your legal training?
20    A.  That is correct, other than the fact
21 that I've read a great deal.
22    Q.  Okay.  Is the Hampden County
23 Correctional Center a large or a small facility?
24           MR. HABHAB:  Objection.

### Page 43

1     Q.  (BY MR. McDONOUGH)  You may answer.
2     A.  Well, as I indicated before, I've not
3 been there and I do not know.
4     Q.  Just a few more questions about your
5 background and then we'll move on.
6         You have never served as a sheriff,
7 correct?
8     A.  Say that again.
9     Q.  You have never served as a sheriff,
10 correct?
11    A.  No; but I've been a deputy sheriff, yes
12    Q.  Is that on your resumé?
13    A.  Yes.
14    Q.  I missed that, I'm sorry.  Where were
15 you a deputy sheriff?
16    A.  I was a deputy sheriff in Dallas County
17 when the Federal Court insisted I be retained.
18    Q.  Let me back up and start over again.
19 You have not been a sheriff but you served as a
20 deputy sheriff in Dallas County?
21    A.  That is correct.
22    Q.  Is that when the Dallas jail system was
23 under a court order?
24    A.  That is correct.

### Page 44

1     Q.  Were you appointed by the federal judge?
2     A.  I was not appointed by the federal
3 judge.  I was appointed by the sheriff under the
4 encouragement of the federal court.
5     Q.  That's Judge Sara Hughes?
6     A.  That's correct.
7     Q.  That's the same one that swore in Lyndon
8 Johnson on the plane?
9     A.  That is correct.  One of the most
10 wonderful people I've ever met.  If it is possible
11 to love a federal judge, I love that one.
12    Q.  She's a famous alum where my son is in
13 college so I know a lot about her?
14    A.  An incredible woman.
15    Q.  Would that be from April, '79 through
16 January, '81?
17    A.  That's correct.
18    Q.  Do I assume correctly that your duties
19 did not involve anything having to do with
20 handicapped compliance there?
21    A.  It had to do with everything.  I was in
22 charge of the entire system.
23    Q.  Did you deal with any handicapped
24 compliance issues in particular in Dallas?

Page 45

1  A.  There were handicapped compliance
2  issues; yes.
3  Q.  Such as?
4  A.  Well, the fact that we, at that time,
5  were not equipped, it was pre-ADA -- we were not
6  equipped with grab bars and items of that sort,
7  but I don't recall specifically how we handled
8  that. I think there was a resolution to it.
9      The Dallas County jail system was a very
10 large system. We were the fifth largest in the
11 country at that time and we used all kinds of
12 imaginative techniques. I think we had a
13 wheelchair that we used for showering so the
14 individual could sit in a wheelchair and then the
15 wheelchair was taken into the showering unit and
16 the individual got out, he got either into his own
17 wheelchair or he used crutches.
18 Q.  Is it correct that these showers in the
19 Dallas jail were not -- they didn't have grab
20 bars, correct?
21 A.  Not at that time; no.
22 Q.  And that you did the best you could, to
23 use your word, to be creative to deal with the
24 situation?

Page 46

1  A.  That is correct.
2  Q.  Is it correct that you did not
3  reconstruct the showers while you were the deputy
4  sheriff?
5  A.  No; we did not. We did plan -- I was in
6  on the planning for a new facility out -- it was
7  under construction at the time that I left.
8      We also were able to, during that
9  period, to use the former Park Lane General
10 Hospital, the one that was replaced where Kennedy
11 went to. We used that as a minimum custody
12 facility and my recollection is that they did have
13 some of the showers that had handicap grab bars
14 and material of that sort but I'll have to admit
15 at this point that my memory is kind of hazy about
16 that.
17     It was not a big issue because we did
18 not have very many handicapped people in the jail,
19 at least during my tenure.
20 Q.  Would you agree with me, based upon your
21 experience with prisons, that it is a relatively
22 rare thing to have a handicapped inmate?
23     MR. HABHAB:  Objection.
24     THE WITNESS:  I can't comment in

Page 47

1  relation to prisons because I'm not that familiar,
2  generally.
3      We're talking about a jail here and
4  we're talking about people who, for the most part,
5  should be pre-trial rather than sentenced, but I
6  think you get a fair number of individuals who are
7  handicapped in one fashion or another, either in
8  terms of being paraplegic or I wouldn't cite some
9  of the other sources but dealing with people who
10 are amputees of one sort or another. We did not
11 have too many of them.
12     There was a tendency on the part of the
13 court to release these people out to the community
14 on either home incarceration or on -- I'm lost for
15 the term -- essentially that they were bonded to
16 their own homes, so the number of people we had
17 were quite -- were few and far between given the
18 size of our facility.
19 Q.  I understand. Doctor, does the Hampden
20 County Correctional Center house pre-trial
21 detainees?
22     MR. HABHAB:  Objection.
23     THE WITNESS:  I would think so.
24 Again, I don't have information here except that I

Page 48

1  do have a document which states his court date as
2  1/30/01 and it includes some follow-up
3  information.
4      I don't have the first page of it but it
5  says, "Follow-Up on 1/11/01," saying that "Connie
6  Bowers spoke to Lieutenant Russell and was moved
7  to C-3 with all privileges on 1/10/01 because it
8  will be another month beforehand rails are
9  installed." Then it refers to some other inmates.
10     There's mention of Partelow again,
11 saying that he will be moved to C for the evening
12 and will have contact visits and it says "inmate
13 was not moved" -- I'm reading literally. It said
14 he was returned to A1-015 on January 12th, '01.
15 "As for showering, he will go to medical and
16 shower there." There's a seal on here marked
17 Defendant's 10.
18 Q.  The question was whether or not you
19 know, Doctor -- whether or not you know if the
20 Hampden County Correctional Center houses
21 pre-trial detainees. Is the answer that you don't
22 know?
23 A.  The answer is that I assume that it
24 does, based on this document.