**49**

Q. Does the Hampden County Correctional Center house sentenced inmates?
A. I do not know.
Q. Is Dallas County the only place where you were a deputy sheriff?
A. No, sir.
Q. Where else?
A. I was retained by the county judge in El Paso County to assist the sheriff. There was litigation threatened regarding the operation of the jail and the sheriff -- the county sheriff of County Dodge, which is the presiding county officer over the county commissioner, retained me to work in the sheriff's department over the sheriff's objection and I had the rank of captain as guard of the jail.
    I stayed there a very, very short time because of conditions regarding the integrity and honesty of the sheriff and I left within about three days of the time that he was arrested. Apparently he was part of a federal sting and apparently they caught him.
Q. Your resumé says that you had the title of -- well, that you were a jail administrator in

**50**

El Paso?
A. That's correct.
Q. Your formal title was captain?
A. Yes; that was a salary grade.
Q. Were you a salaried employee from the government there?
A. Yes.
Q. Did you get a W-2 form?
A. I would suppose I did. This was 1982, '81, somewhere there.
Q. Yes; '81 to '82. I guess what I'm trying to get at: Were you paid by the Court or were you paid by the taxpayers?
A. I was paid by the county, as was every other employee. There were no separate checks from the sheriff's department or any other department.
Q. That brief period of time in El Paso, did you have any duties specifically pertaining to handicapped compliance?
A. It was never an issue.
Q. Were you a sheriff or a deputy sheriff anywhere else?
A. No.

**51**

Q. Were you a W-2 employee of a prison or jail anywhere else?
A. No.
Q. It appears that the rest of your resumé involving your work was either a consultant or a professor, is that correct?
A. That is correct.
Q. My particular focus, as I'm sure you've figured out, Doctor, is I'm very interested in all of your work as an employee in a prison or a jail. Have you told me all such work?
A. In terms of consulting or?
Q. No; not as a consultant, as an employee -- as a W-2 employee working for the government in a prison or jail?
A. No; I have not. I have no other employment in that fashion.
Q. Thank you. You've already made reference to some various terms within the Hampden County Correctional Center.
    You made reference to the term Davis 1, do you remember saying that?
A. Yes.
Q. What is Davis 1?

**52**

A. I assume it's a housing unit.
Q. What is C -- you said C as in Charlie, remember?
A. Yes; C as in Charlie. The reference was, as I recall, that it was a high security unit, what we'd ordinarily call a lock-down unit and -- as opposed to a minimum security unit where inmates are given a great deal more latitude to move around in the housing area and apparently can go elsewhere to take their meals rather than in the housing unit, itself, which is characteristic of a lock-down unit.
Q. What is B Tower?
A. I told you I had some difficulty distinguishing between B and D Tower. I assume that it represents a series of floors in the D unit.
Q. Forgive me, Doctor, are you saying D as in Daniel?
A. Yes.
Q. I said B as in boy, though?
A. I would assume that's essentially -- I don't know what B as in boy unit is.
Q. Do you know what the difference between

Page 53

1  Davis and B as in boy tower is?
2     A.  No; I do not.
3     Q.  Are you able to tell me which living
4  unit Mr. Partelow was in?
5     A.  I believe he was in several different
6  units. He was in A; he was in C. I believe he
7  was also in --
8           MR. McDONOUGH: (Interposing)
9  Doctor, we're just going to go off the record for
10 a minute. I think Mr. Chamberland is here.
11          (Discussion off the record.)
12    Q.  (BY MR. McDONOUGH) Doctor?
13    A.  Yes.
14    Q.  I think we're going to go back on the
15 record now.
16    A.  Okay.
17    Q.  Have you ever met the Plaintiff,
18 Mr. Partelow?
19    A.  No; I have not.
20    Q.  Do you know how old he is?
21    A.  No; I do not.
22    Q.  Do you know anything about his
23 background?
24    A.  Other than the fact that he served twice

Page 54

1  in the Marine Corps and that he was injured in an
2  accident. The nature of the accident or whatever
3  it was resulted in a loss of part of his -- I
4  think it's his left leg.
5     Q.  Your understanding is he lost his leg in
6  a military accident?
7     A.  No; in an industrial accident.
8     Q.  Do you know what his criminal record is?
9     A.  There's some references to it. I saw
10 one reference, apparently he is a petty offender,
11 petty theft sort of thing.
12    Q.  You've never talked to him, correct?
13    A.  No; I have not.
14    Q.  Have you made any judgments as to his
15 credibility?
16    A.  No; I have not.
17    Q.  Have you made any assumptions about his
18 credibility?
19    A.  Let me answer that question this way.
20 I've worked with the criminal justice field for
21 over fifty-four years and I'm inclined to --
22 unless I have information to the reverse, that
23 individuals represent themselves in a way that's
24 most beneficial to themselves so as a consequence,

Page 55

1  I kind of listen to what's being said, what the
2  inmate is saying and then match it up against what
3  reality is and made a judgment accordingly. Some
4  lie, just as some non-prisoners lie.
5     Q.  But with regard to Mr. Partelow, given
6  that you've never met him and that you've never
7  spoken to him, is it fair to say that you are not
8  assuming that every single thing he has said in
9  connection with this case is the truth?
10    A.  I would say that I would not assume that
11 anything that anyone says is totally the truth,
12 including Mr. Partelow.
13    Q.  Is it your understanding -- I think you
14 already told me that you understood Mr. Partelow
15 was housed in different housing locations,
16 correct?
17    A.  That's correct.
18    Q.  Do you have any facts indicating to you
19 why he was moved?
20    A.  No.
21    Q.  No?
22    A.  I know the only time that he was moved
23 was on the basis of his complaint and moved to the
24 C unit which did have at that time intact showers.

Page 56

1     Q.  Your understanding at some point in time
2  Mr. Partelow was moved from one living unit into C
3  Tower because C Tower had compliant showers?
4     A.  That is correct.
5     Q.  Do you have any criticisms of the
6  showers in C Tower?
7     A.  I've never seen them so I don't know.
8     Q.  So you have no criticisms, then?
9     A.  Right.
10    Q.  Are you critical of the decision to move
11 Mr. Partelow to C Tower?
12    A.  My criticism is that you have an
13 individual who is not a maximum security
14 classified individual being placed in maximum
15 security for the convenience of the facility in
16 order to allow him to shower.
17       On that basis, they took his rights to
18 visitation and other privileges that are common in
19 a low security unit away from him in order to
20 satisfy his need to shower.
21       I think the decision -- and I think it
22 was a wise one -- to have him shower in the
23 medical unit, which did have such facilities,
24 would have been a far better choice.

**Page 57**

1  Q. So let's try to break that down. You
2  have no criticisms of the decision to allow him to
3  shower in the medical unit?
4  A. No.
5  Q. In fact, you're pleased with that
6  decision?
7  A. I think it was the sensible decision
8  given the fact that the man obviously had problems
9  showering in that he had fallen a number of times
10 and he was well-known in the health unit to say
11 we're dealing with him on a reasonable basis to
12 handle it.
13 Q. You think it's reasonable to allow him
14 to shower in the medical unit in order to
15 accommodate his disability?
16 A. Lacking other facilities that were
17 consummate with his needs; yes.
18 Q. It is your understanding, though, that
19 for at least some period of time Mr. Partelow was
20 housed in unit C where there were better showers?
21 A. I think he was there. I believe he was
22 there for one day.
23 Q. What is your understanding as to why he
24 left?

**Page 58**

1  A. Because his privileges were being
2  denied. He couldn't have visitors, among other
3  things.
4  Q. But more specifically, do you have an
5  understanding as to whose request it was that he
6  would leave C Tower?
7  A. I'd have to check back on that. I don't
8  know.
9  Q. Let me ask you a more specific question.
10 Do you know whether or not it was Mr. Partelow who
11 requested that he be taken out of C Tower?
12 A. Yes; it was Mr. Partelow. Just merely
13 his requesting it would not necessarily result in
14 action. Somebody on the staff had to agree to it.
15 Q. Do you have any understanding as to
16 whether there was an agreement to his request to
17 leave C Tower?
18 A. Yes; there was.
19 Q. Are you critical of the decision to
20 accommodate Mr. Partelow's request to leave C
21 Tower?
22 A. No; not at all. I don't think he should
23 have been placed there in the first place.
24 Q. Are you critical of Mr. Partelow for

**Page 59**

1  requesting to leave C Tower?
2  A. No.
3  Q. You're not critical?
4  A. I'm sorry, let's run that question by me
5  again.
6  Q. That's a good idea. Are you critical of
7  Mr. Partelow's decision to request that he leave C
8  Tower?
9  A. Under the conditions of confinement,
10 yes.
11 Q. You are critical?
12 A. I am not critical; no.
13 Q. You're not critical. Why are you not
14 critical?
15 A. Because I don't think it was appropriate
16 housing for him.
17 Q. Well, have you ever heard the expression
18 safety comes first?
19 A. Well, certainly.
20 Q. Do you agree with it?
21 A. I think this is the basic principle of
22 jail management, that you want safety for inmates
23 and you want safety for staff.
24    I don't think that Partelow presented

**Page 60**

1  any particular risk to anybody.
2  Q. How about his own personal safety in
3  terms of handicapped compliant conditions?
4  A. You have a delicate balancing situation
5  here, and that is his rights as a pre-trial
6  prisoner who has not been convicted and the rights
7  of the jail to assign people to wherever they want
8  to do it, wherever they want to put him.
9     I think since there were other
10 acceptable alternatives that were available,
11 namely the health unit, for showering, I think
12 that should have been the first choice rather than
13 to put him in a maximum security unit.
14 Q. In terms of accommodating his handicap,
15 Doctor, would you agree with me that C Tower was
16 safer than Davis or B Tower?
17 A. I don't know.
18 Q. Do you believe, based on your experience
19 in corrections, that a prison administrator or a
20 jail administrator should take into consideration
21 the physical limitations of an inmate when housing
22 an inmate?
23 A. Absolutely.
24 Q. That's a proper area for them to take

Page 61

1  into consideration?
2    A.   That is correct; yes.
3    Q.   Do you believe that it was not within
4  the correctional staff discretion to house
5  Mr. Partelow in C Tower where there were
6  handicapped compliant showers?
7    A.   Well, interestingly, since you ask the
8  question in that form, if that would have been the
9  most desirable arrangement, then probably he
10 should have been assigned to the C Tower when he
11 got into the jail, and he was not.
12       All sorts of jerry-built arrangements
13 were tried to be established for him by giving him
14 a plastic chair that he could balance on, stuff
15 like this, and finally this moving him up to C
16 Tower was a kind of final arrangement as far as
17 they knew they had to do.
18       I say that was a poor choice when you
19 have lesser levels of security levels, and
20 Mr. Partelow was not about to escape or injure
21 anybody so there was no need to place him in the
22 maximum security unit.
23       There were lower levels of security that
24 were available, and since they were, they should

Page 62

1  have been used.
2    Q.   Would you agree with me that the Hampden
3  County correctional staff accommodated
4  Mr. Partelow's request to be taken out of C Tower?
5    A.   Yes; they did.  Yes.
6    Q.   Do you understand that he was allowed to
7  shower in the Medical Department thereafter?
8    A.   For a short period of time; yes, but
9  that was discontinued.
10   Q.   What is your understanding as to your
11 assumption that it was discontinued -- strike
12 that.  That was a poor question.
13       What's the basis for your conclusion
14 that allowing him to shower in the medical unit
15 was discontinued?
16   A.   I think I was advised by Plaintiff's
17 counsel.
18   Q.   Other than what you were told by
19 Plaintiff's counsel, do you have any documentary
20 or other objective evidence that that is true,
21 that he was not permitted to continue to shower in
22 the medical unit?
23   A.   No; I do not, but let me follow up by
24 saying that the records that were provided were

Page 63

1  very, very sketchy.
2        An awful lot of things apparently went
3  on that were not reported except by somebody's
4  later memorandum indicating that something had
5  happened, though I don't think that there was as
6  much emphasis on keeping track of what was going
7  on in terms of a formal paper trail as ordinarily
8  I think a well-managed jail would have.
9    Q.   Is it your opinion that this is not a
10 well-managed jail?
11   A.   Only in relation to the paper trail.  I
12 don't know about anything else.
13   Q.   You said it's your belief that things
14 went on that were not documented?
15   A.   That's correct.
16   Q.   Can you name one?
17   A.   The fact that he was -- the fact that he
18 fell several times and this was never reported.
19 In fact, the only reference -- if I may add to
20 that -- the only reference to the fact that he
21 fell twice already appears in the document marked
22 Defendant's Exhibit 10 and there are no incident
23 reports that were provided to me at least which
24 indicated that he had fell -- fallen.

Page 64

1        It's on that basis that I assume that
2  the records are either very sanitized or are not
3  complete.
4    Q.   Do you have any basis for any assumption
5  that any records were sanitized, Doctor?
6    A.   I gave two alternatives and I don't have
7  any choice for either one.
8    Q.   Exhibit 10 -- do you have Exhibit 10?
9    A.   I'm having trouble hearing again.
10   Q.   Do you have Exhibit 10?
11   A.   I'm sorry?
12   Q.   Do you have Exhibit 10 that you just
13 referred to?
14   A.   Yes.
15   Q.   Would you get that, please?
16   A.   Yes.
17   Q.   Just so we're clear, what's Exhibit 10?
18   A.   Defendant's Exhibit 10, Partelow, dated
19 11/16/04.
20       MR. McDONOUGH:  So we don't have any
21 confusion, I'm going to ask the court reporter to
22 mark that document as the next exhibit in this
23 deposition, okay?
24       THE WITNESS:  Fine.

Page 65

1  (Defendant's Deposition Exhibit
   No. 7 offered and marked.)
2
3  Q. (BY MR. McDONOUGH) We've now marked
4  that and we'll hereafter refer to that as
5  Exhibit 7 in the Newman deposition, okay?
6  A. Okay.
7  Q. Thank you. That document is --
8  references to the fact that he fell twice already,
9  correct?
10 A. That's correct.
11 Q. Do you know what this document is?
12 A. I don't have a clue.
13 Q. Do you know who created it?
14 A. No. It's obviously a report by somebody
15 in authority.
16 Q. Okay. Do you believe this Exhibit 7 was
17 sanitized?
18 A. No.
19 Q. Okay.
20 A. No; I did not say that. I said there
21 were no Incident Reports that were provided to me
22 that indicated that Mr. Partelow had fallen in the
23 shower several times.
24     It would seem to me that if I were the

Page 66

1  unit commander, I would say to the officer that I
2  want a report to that effect, if for no other
3  reason than to protect the county in the event
4  that there's a lawsuit.
5  Q. Are you assuming in that scenario that
6  you just painted that in fact an officer witnessed
7  the fall?
8  A. No; but he would certainly have known
9  that he had fallen.
10 Q. How would he know?
11 A. Because the inmate told him.
12 Q. What basis do you have for the
13 assumption that the inmate told anybody that he
14 fell?
15 A. Well, the fact is that he was bleeding
16 and I assume, given the condition that he was in,
17 he was taken to the health unit and they then
18 proceeded either to bandage it or I think there's
19 a reference someplace that they put -- I'm at a
20 lost for the term -- essentially a stretch bandage
21 on it to control the bleeding.
22 Q. Is it your assumption that Mr. Partelow
23 reported to anyone in the medical unit that he had
24 fallen and had sustained bleeding to his leg?

Page 67

1  A. Well, they obviously knew about it
2  because it's documented in this report.
3  Q. Well, let's go back to this, sir. We're
4  back to Newman 7. Do you have it?
5  A. Yes.
6  Q. It says a couple of issues he would like
7  addressed. "He is in a handicapped cell" and then
8  it goes on.
9      Do you assume that this is a record of a
10 report from the Plaintiff when it says he is in a
11 handicapped cell?
12 A. Yes; I think this was an interview with
13 somebody or other, although there's no indication
14 who it was.
15 Q. Exhibit 7 of your deposition, that's a
16 record of report of a fall made by the Plaintiff,
17 Mr. Partelow, himself, correct?
18 A. I don't know. I don't know who the
19 author of the report is or the circumstances.
20 Q. Well --
21 A. (Interposing) And you're asking me to
22 speculate and I'm not willing to speculate.
23     Obviously something was happening
24 because somebody in authority knew that something

Page 68

1  was happening.
2  Q. Right.
3  A. And beyond that point, I'm not going to
4  speculate other than the fact that the record
5  records that he had fallen twice. He said so. It
6  doesn't say he didn't say so.
7      It states a rather blunt fact that he
8  fell twice and then it raises the question --
9  which is the question I think you're coming to --
10 what does he do for a shower; and a follow-up, if
11 you go down to the lower three, four items, it
12 says after speaking with Lieutenant Cadigan, I
13 guess it is at 2:45 p.m., inmate Partelow will be
14 moved to unit C-4 this evening and will have
15 contact visits.
16     The next then says inmate was not moved
17 but instead was returned to A1-015 on 1/12/01 at
18 2:21 p.m. As for showering, he will go to medical
19 and shower there.
20     That's the extent of my knowledge based
21 on this record.
22 Q. Getting back to the subject of falls,
23 would you agree with me, Doctor, that it's
24 entirely possible that an inmate can fall and then

**Page 69**

1 get up and if it's not witnessed by a correctional
2 officer, there won't be any report unless the
3 inmate reports it?
4   A.  It's the old philosophical question, if
5 a tree falls in the forest and you don't hear it,
6 did it really fall. I don't know the answer to
7 that.
8   Q.  In your experience in prisons, is it
9 inconceivable to you that an inmate can fall and
10 then get up and no officer would see it?
11   A.  I think it is conceivable, yes, but in
12 this instance where his fall was with a chair that
13 moved, the officer would probably be notified in
14 order to get help to get him up and so forth.
15       I think it's -- this information travels
16 very, very rapidly in a jail, particularly in a
17 single housing unit.
18   Q.  As far as this particular case is
19 concerned, Doctor, you're speculating, aren't you?
20   A.  That's all we have to work with, because
21 there's no record.
22   Q.  If an inmate is injured, would you agree
23 with me that the person you would expect to be
24 most likely to report that injury would be the

**Page 70**

1 injured inmate, himself?
2   A.  That is correct. Let me add that if he
3 does report it, then there should be an Incident
4 Report.
5   Q.  And if he does not report it, would you
6 expect there to be an Incident Report?
7   A.  I would still expect to have an Incident
8 Report saying that Mr. Partelow or inmate X was in
9 the shower and that he fell and from what I could
10 observe, the reporting officer, there were no
11 injuries or there were injuries or whatever.
12       Again, as I said, my injunction, if you
13 will, to officers was you reported everything no
14 matter how trivial in order to protect the person
15 that you are working for.
16       Without any other information, you make
17 the assumption that what the inmate is saying is
18 true. I think the presumption lies in favor of
19 the inmate if the officer hasn't recorded it.
20   Q.  I don't mean to belabor it, Doctor.
21 I'll ask one more question and then I'll move on.
22       Would you agree with me, Doctor, that if
23 an inmate doesn't report an injury and was not
24 witnessed by an officer, you would not expect to

**Page 71**

1 find an Incident Report, isn't that fair?
2   A.  Yes.
3   Q.  Thank you. Let me add another caveat to
4 that analysis.
5       If the inmate does not observe it and
6 the injured person does not report it, but the
7 officer becomes aware of it by other inmates, then
8 there should be an Incident Report, but if the
9 officer does not witness it nor does the officer
10 become aware of it from another inmate and if the
11 inmate, himself, does not report his own injury,
12 you would not expect to find an Incident Report,
13 would you?
14   A.  That is correct.
15   Q.  Again, I just want to make sure I have
16 it clear.
17       Your belief is that at some point in
18 time Mr. Partelow's use of the shower in the
19 medical unit was discontinued?
20   A.  That's my understanding; yes.
21   Q.  And your only basis for that is what you
22 were told by the lawyer, is that correct?
23   A.  Right. I'm inclined to believe him.
24   Q.  Why are you inclined to believe him?

**Page 72**

1   A.  Well, lawyers always tell the truth.
2   Q.  Do you know who Leslie Wilson is?
3   A.  No; I do not.
4   Q.  Do you know whether or not Mr. Partelow
5 was represented by legal counsel during this time
6 period?
7   A.  I do not.
8   Q.  Do you know whether the Hampden County
9 Correctional Center has an ADA coordinator?
10   A.  Yes.
11   Q.  What do you know about that?
12   A.  I know that they have one.
13   Q.  How do you know that?
14   A.  Because it's written on a complaint form
15 that a copy was referred to the ADA coordinator.
16   Q.  Do you know who the ADA coordinator was?
17   A.  I'll have to go back and find it. Yes;
18 Captain E-A-R -- it isn't complete, but the first
19 four letters are B-A-R-B and I think the last
20 three letters that I can see, because it runs out
21 the page, is A-R-C.
22   Q.  Thank you.
23   A.  That's in the document dated -- it is on
24 the grievance form dated 2/6/01 and a response

Page 73

1 February 8th, '01.
2  Q.  Thank you, Doctor. Jumping back, I've
3 just got, hopefully a few more isolated topics to
4 deal with.
5       Just on the medical record, did the
6 Plaintiff ever report to anybody in the Medical
7 Department that he had injured himself falling in
8 the shower?
9  A.  I don't recall.
10 Q.  If an inmate hurts himself in a fall in
11 a shower in a correctional facility, would you
12 expect that inmate to report it to the medical
13 personnel?
14 A.  I think that the condition would, in
15 itself, be reported -- that is, if he were
16 bleeding, I would assume that that would represent
17 some kind of injury.
18 Q.  Again, would you expect the inmate to
19 report to the medical staff how he became injured?
20 A.  A prudent man would probably do that. I
21 do not expect prudence on the part of prisoners.
22 Q.  Would you expect -- well, strike that.
23 What is your understanding as to the availability
24 of medical care to Mr. Partelow in this facility?

Page 74

1  A.  I think medical care is available.
2  Q.  Do you have any criticisms of the
3 medical care given to Mr. Partelow?
4  A.  No; I do not because I'm not competent
5 to make that assessment.
6  Q.  Well, do you understand -- do you have
7 any understanding that Mr. Partelow was in any way
8 dissatisfied with the quality of his medical care?
9  A.  No; nor do I have any indication that he
10 approved the quality of the medical care he
11 received.
12 Q.  From a standpoint of the physical
13 location, do you know where the medical care was
14 available to Mr. Partelow?
15 A.  I assume it's somewhere within the
16 facility.
17 Q.  Well, I'd rather you not make any
18 assumptions. Do you know?
19 A.  No; I do not know.
20 Q.  Do you know whether the Medical
21 Department is in a separate building?
22 A.  I do not know.
23 Q.  Do you know whether or not there's a
24 medical provider available to Mr. Partelow in B

Page 75

1 Tower?
2  A.  I do not know.
3  Q.  Do you know whether there's a medical
4 professional available to Mr. Partelow in Davis
5 Tower?
6  A.  No; I do not.
7  Q.  Do you know if there's a medical
8 professional available to Mr. Partelow in C Tower?
9  A.  Now, what you're saying available, do
10 you mean physically present or that somebody, on
11 the basis of the last questions you asked saying
12 is there a medical person available, I think the
13 answer in each of those would in all likelihood be
14 yes, since they apparently all work out of a
15 single health unit, which is an appropriate way of
16 operating, instead of having people decentralized,
17 so the answer is conditioned on that understanding
18 that somebody does not have to be physically
19 present in the housing unit in order to be
20 accessible.
21 Q.  Thank you. That's a very fair comment,
22 Doctor. It's going to cause me to clarify my
23 question. I meant, but did not make clear,
24 physically present in the unit so let me just try

Page 76

1 to ask it with one question.
2       Do you have any knowledge as to whether
3 or not there was a medical professional physically
4 present in Davis Tower, B Tower, and C Tower?
5  A.  No.
6  Q.  Is it your understanding that the
7 showers were in the process of being renovated
8 when all this was happening, Doctor?
9  A.  That's my understanding.
10 Q.  I assume that you agree that it's a good
11 thing to renovate the showers to make them
12 handicapped compliant, correct?
13 A.  I believe that is a very good thing;
14 yes.
15 Q.  Would you agree that while such a thing
16 is happening, that that is going to cause a
17 certain amount of inconvenience to the handicapped
18 individuals?
19 A.  Well, certainly; yes.
20 Q.  Would you also agree that at least while
21 this good thing is happening -- namely
22 retrofitting and renovating the showers -- that
23 there may be a temporary situation where the
24 handicapped accessible showers may not be

**Page 77**

1 available every single day to handicapped inmates?
2   A.  Well, to put this in a slightly
3 different context, there were, in the health unit,
4 a handicapped available unit twenty-four hours a
5 day, seven days a week.
6       The issue is not whether they were
7 available anyplace; it's whether there was an
8 acceptable unit available -- and there was. It
9 was in the health unit.
10  Q.  Do you consider and hold yourself out as
11 an expert in jails and prisons?
12  A.  In jails; yes.
13  Q.  You draw the distinction between jails
14 and prisons?
15  A.  Yes.
16  Q.  Would you explain your distinction to
17 me?
18  A.  Ordinarily, jails hold -- for the most
19 part, hold persons who are awaiting trial and, of
20 course, will hold some sentenced inmates.
21      Prisons, on the other hand, with rare
22 exceptions don't hold pre-trial inmates unless
23 it's a high profile individual. Everybody there
24 in the prison has been sentenced for a finite

**Page 78**

1 period of time or whatever. That distinction is
2 there.
3   Q.  Insofar as handicapped accessible
4 showers, is there any distinction between jails
5 and prisons in your view?
6   A.  No. I might add that when I did the
7 work for the attorney general's office regarding
8 the Potosi Institution in Missouri -- the official
9 name of that is the Western Missouri Correctional
10 Institution, the first of which was under a class
11 action suit, the first problem that we attacked
12 was the lack of handicapped facilities, so prisons
13 have the same kind of problems that jails do in
14 regard to dealing with the handicapped, yet there
15 are a number of individuals who come into prisons
16 who are handicapped -- physically handicapped in
17 terms of, like Mr. Partelow, with an amputee. I
18 think a far fewer would come into jails,
19 ordinarily.
20  Q.  I'm intrigued with your last answer
21 regarding the Potosi, Missouri prison which you
22 said one of the first issues you attacked was the
23 handicapped accessibility of the prison?
24  A.  Yes.

**Page 79**

1   Q.  What was your involvement in that
2 insofar as the handicapped access was concerned?
3   A.  I set forth an agenda for the attorney
4 general's office telling them what needed to be
5 done in terms of the expansion of the personal
6 hygiene facilities.
7       I should mention that it was what they
8 call a dry cell prison. There was no water in any
9 of the units. There was no commodes or anything
10 of that sort so the inmates had to be released
11 from their individual housing unit to go to the
12 toilets that were available.
13      Retrofitting a prison is not a simple
14 task. You just don't cut a hole in the wall and
15 put something in. When the final design was done
16 and approved by the state architect, I think it
17 was several millions of dollars in order to make
18 the changed in the units, to put toilets in the
19 unit, to have handicapped cells with the
20 appropriate equipment as well as to have
21 handicapped showers. You can't ordinarily shower
22 inside in a cell unit.
23      This was a major project. It lasted
24 several years and when the case finally came up

**Page 80**

1 for hearing before Federal Court, they dismissed
2 it on the basis that the prison had made
3 sufficient changes in order to qualify as
4 acceptable under the federal court's decision.
5   Q.  What year was that, Doctor?
6   A.  I'll have to check that.
7   Q.  Generally or roughly?
8   A.  You have my resumé there.
9   Q.  I do.
10  A.  I have so much paper I'm working off of.
11 It's a small paper.
12  Q.  Was this as a consultant?
13  A.  Yes.
14  Q.  To the attorney general of Missouri,
15 this would be '95 to '97?
16  A.  Correct.
17  Q.  Were your recommendations in writing?
18  A.  Yes; there was a report submitted to
19 him.
20  Q.  Do you have a copy?
21  A.  No; I do not.
22  Q.  Why did you not keep a copy?
23  A.  That's a good question.
24  Q.  Did you have any --

Page 81

1   A.   (Interposing) I'm sure it can be
2   obtained. I left working with the state on a very
3   good working relationship. The attorney's name --
4   Q.   (Interposing) Let me ask you a different
5   question, Doctor.
6        Did any of your recommendations deal
7   with making the showers handicapped accessible?
8   A.   The attorney in that case was David
9   Johnston.
10  Q.   Was he in the attorney general's office?
11  A.   Yes.
12  Q.   Did you hear my last question? Let me
13  repeat it.
14       Did any of your recommendations in that
15  Missouri case specifically deal with making the
16  showers handicapped compliant?
17  A.   The recommendations were made to the
18  architect verbally and he agreed and then he also
19  submitted a plan to the state.
20  Q.   Did you submit a written recommendation?
21  A.   I submitted a whole series of written
22  recommendations and to this day, I do not recall
23  why I did not retain those but I do not have them
24  in my files.

Page 82

1   Q.   Did your written recommendations include
2   a recommendation to make the showers handicapped
3   accessible?
4   A.   Yes.
5   Q.   You're sure?
6   A.   Well, at this juncture I'm about as sure
7   as I can possibly be.
8   Q.   Will you agree -- you said -- I think
9   you said that this report was accessible to you?
10  A.   Yes.
11  Q.   Will you agree to make an effort to get
12  a copy?
13  A.   Yes; certainly.
14  Q.   Thank you. Now, is it your opinion as
15  an expert that inmates are required to shower
16  every day?
17  A.   I think it's desirable; yes.
18  Q.   That's not what I asked you, was it,
19  Doctor?
20  A.   Pardon me?
21  Q.   That's not what I asked you, was it?
22  A.   No.
23  Q.   How about answering my question? I'll
24  restate it.

Page 83

1        Is your opinion as an expert that
2   inmates are required --
3   A.   (Interposing) No; they are not required.
4   They have to have access to showering, I believe,
5   but there is an American Correctional Standard
6   that they shower three times a week.
7   Q.   So it is clear, it's not your opinion
8   that inmates be required to shower every day, is
9   that correct?
10  A.   That's correct.
11  Q.   You have some familiarity with the
12  American Correctional Standards?
13  A.   American Correctional Association
14  Standards For Jails.
15  Q.   Do you possess your own copy of the ACA
16  Standards?
17  A.   Yes; I do.
18  Q.   Do you have it with you, today?
19  A.   No; I do not.
20  Q.   Where is it?
21  A.   In my pile, my bookcase.
22  Q.   In the building that you are in now?
23  A.   Yes; I did not refer to it because I was
24  familiar with its contents.

Page 84

1   Q.   Is it your opinion that there is an ACA
2   Standard that is applicable to this case?
3   A.   I would say either the American
4   Correctional Association Standard or the American
5   Correctional Health Association Standard. It may
6   be in both or it may be only in one.
7        At this particular juncture, I don't
8   recall and I will check that out if you want me
9   to.
10  Q.   What standard are you thinking of?
11  A.   The standard requiring handicapped
12  accessible showers as well as other handicapped
13  accessible opportunities.
14  Q.   Are you familiar with an accreditation
15  process?
16  A.   Yes.
17  Q.   Conducted by the ACA?
18  A.   Yes.
19  Q.   Is the Hampden County Correctional
20  Center accredited under the ACA?
21  A.   I do not know.
22  Q.   Do you know any officials at the ACA?
23  A.   Currently, no. For years, I was
24  intimately involved with a variety of officials

Page 85

and was very active with the American Correctional Association.

In recent years I've cut down my activity to very little of such activity and very, very little travel.

Q. Did you ever do work for the ACA?
A. Yes.
Q. As a consultant?
A. Yes.
Q. Can you name any individuals that you worked with at the ACA?
A. I'll have to get that for you. I'm sorry, I don't recall.
Q. When was the last time you did work with the ACA?
A. I believe the contract with the American Correctional Association that I had with the Law Enforcement Assistance Administration, and this was -- the Law Enforcement Assistance Administration -- LEAA was a unit under the U.S. Department of Justice.

I did a whole series of consultations for ACA and an organization called Macrosystems, which involved going into jails on a variety of

Page 86

projects and I don't specifically recollect which ones were ACA projects and which were Macrosystems. This was from about 1978 to about 1990.

To my knowledge, the project in Rhode Island was an ACA project that I referenced earlier on when you asked whether I had done any work in the New England states. That's the only one that I can recall. It probably was under ACA.

Q. Doctor, not much more, thankfully. Can you name me a single jail or prison that is ACA accredited in the Commonwealth of Massachusetts?
A. No; I cannot.
Q. Can you name me a single prison or jail that's accredited in New England?
A. No; I cannot.
Q. Can you name me a single jail or prison that's ACA accredited in the Northeast?
A. No; I cannot, because I do not keep that kind of information.
Q. Can you name me a single jail or prison that's ACA accredited in the United States?
A. Now we're dealing with something different. The county jail in Kansas City was

Page 87

accredited by ACA and I was retained to help deal with the problems that they were facing.

I don't have a great deal of confidence in the ACA accreditation system because it does not deal specifically with operations but rather deals with compliance with a whole series of standards.

That is, they have compliance requirements for each of the ACA standards and they run into hundreds and they really don't get into the problems of overcrowding. They don't get into problems of certain facilities lacking at all so as a result, as I said, I don't have a great deal of confidence in how meaningful these accreditation standards really are in terms of actual jail operations.

Q. Did you say that the ACA accreditation process does not deal with operations?
A. In terms of seeing how they actually operate as opposed to what the policies and procedures suggest how they operate.

In other words, you have to -- you can have policies and procedures which say you're supposed to do A, B, and C and that would meet the

Page 88

accreditation requirement as one of their requirements but whether the jail or prison actually follows those recommendations are not examined.

Q. Do you know what a site visit is?
A. Yes.
Q. Do you believe the ACA does not do site visits?
A. Yes; they do site visits but you cannot tell how a jail operates based on a site visit.
Q. How long are the site visits done by the ACA -- how extensive are they?
A. Anywhere from one to two days.
Q. In general, Doctor, would you say that if a prison or a jail is accredited by the ACA, you'd be impressed with that, as a general statement?
A. As a general statement, yes, because it suggests to me that at least they're interested in being recognized as a quality facility and to that extent, I agree, but I don't think it means as much in terms of actual operations as the general public or others would be inclined to give it, really.

89

1  Q. Would you agree with me that the ACA
2  Standards are generally higher than the standards
3  set by state regulations?
4  A. That's a difficult question to answer
5  because very frequently when a state sets
6  standards, they use the ACA as the prototype for
7  writing their standards.
8      In other words, I could go into the one
9  in Missouri for which I'm most familiar because I
10 worked there, and look at the Missouri -- Missouri
11 is a bad choice. Indiana, for example, is a state
12 that has state standards for jails. If you look
13 at the state standards and you look at the ACA
14 Standards, they are virtually the same.
15     I wouldn't say they're plagiarized but
16 they reference the same topics and the language
17 style is very similar.
18 Q. Would you agree with me, Doctor, that
19 the vast majority of prisons and jails do not meet
20 the ACA accreditation standards?
21 A. Absolutely.
22 Q. Doctor, I'm sorry, I didn't get your
23 date of birth?
24 A. September 22, 1926.

90

1  Q. Doctor, let me just try to wrap up here.
2  Is it your understanding that this situation
3  regarding Mr. Partelow occurred while the Hampden
4  County facility was in the process of renovating
5  their showers? Is that your general
6  understanding?
7  A. General understanding; yes.
8  Q. Do you agree that there was at least an
9  attempt made by the correctional staff to
10 accommodate Mr. Partelow's handicap?
11 A. I think their initial attempts were
12 rather short-sighted and resulted in injury to
13 Mr. Partelow.
14 Q. I understand that you're not satisfied
15 with the attempt but would you at least agree with
16 me that the correctional staff made attempts to
17 accommodate him?
18 A. If they do something wrong, that
19 represents an attempt to satisfy, is that the
20 implication?
21 Q. I understand that it's your opinion that
22 their attempts were insufficient, is that correct?
23 A. I would say that beyond being
24 insufficient, they were incorrect.

91

1  Q. Fair enough. I'm not trying to
2  challenge your conclusions in that regard but you
3  will agree with me, will you not, Doctor, that
4  there was at least some attempts made to
5  accommodate him, wouldn't you?
6  A. Yes.
7  Q. One of the attempts was to give him a
8  chair in the shower?
9  A. That was a dangerous alternative.
10 Q. I understand, but you're getting ahead
11 of me.
12 A. Okay.
13 Q. Do you understand that they did provide
14 him a chair in at least an attempt to accommodate
15 him?
16 A. Yes.
17 Q. Would you agree that they gave him a
18 wheelchair while he was in the facility?
19 A. Yes.
20 Q. Would you agree that they gave him a
21 handicapped compliant cell when he was in -- well,
22 a handicapped compliant cell, apart from the
23 showers?
24 A. I don't know.

92

1  Q. Would you agree that they let him use an
2  elevator?
3  A. Yes.
4  Q. Would you agree that they transferred
5  him to C Tower because C Tower had accessible
6  showers? Would you agree to that?
7  A. I would agree that that's what they did;
8  yes.
9  Q. Would you agree that they took him out
10 of C Tower when he asked to be taken out of C
11 Tower?
12 A. That's correct.
13 Q. Would you agree that they permitted him
14 to use the showers in the Medical Department for a
15 period of time?
16 A. Yes.
17 Q. Would you agree that all those were at
18 least attempts to accommodate his handicap?
19 A. Oh, I think that they are attempts; yes.
20     MR. McDONOUGH: I think I'm all
21 done, Doctor. Just let me take a quick look at my
22 notes and I appreciate your time very much.
23     (Pause in proceedings.)
24 Q. (BY MR. McDONOUGH) One thing I forgot

**93**

1  to ask you.
2           Did anyone at the correctional staff
3  ever apologize to Mr. Partelow for the
4  inconvenience he was experiencing?
5       A.   I have no knowledge of that.
6           MR. McDONOUGH: Doctor, thank you
7  very much. That's all the questions I have.
8  We'll be sending you the transcript. I don't know
9  if counsel has any questions.
10          MR. CHAMBERLAND: I don't have any
11 questions, Doctor, but I'll be speaking to you
12 later.
13          THE WITNESS: Very good.
14          MR. McDONOUGH: We'll go off the
15 record.
16          (The deposition was concluded.)
17                    *****

**94**

1           SIGNATURE PAGE - ERRATA SHEET
2       To be signed by deponent and returned to
3  counsel within thirty (30) days.
4       I, the undersigned, CHARLES L. NEWMAN, do
   hereby certify that I have read the foregoing
5  transcript of my testimony given in the matter of
   WARREN PARTELOW vs. COMMONWEALTH OF MASSACHUSETTS
6  ET ALS, on MARCH 23, 2005 and that, to the best of
   my knowledge, said transcript is true and accurate
7  (with the exception of the following corrections
   listed below:)
8
9
10 Page : Line:
11
12
13
14
15
16
17
18
19
20
21 DEPONENT'S SIGNATURE: _____
   DATE: _____
22
23 jc

**95**

1  COMMONWEALTH OF MASSACHUSETTS
   COUNTY OF HAMPDEN
2
3       I, JOANNE COYLE, a Notary Public within and
   for the Commonwealth of Massachusetts at large, do
4  hereby certify that I took the deposition of
   CHARLES L. NEWMAN, pursuant to the Federal Rules
5  of Civil Procedure, at the offices of Egan,
   Flanagan and Cohen, P.C., 67 Market Street,
6  Springfield, Massachusetts, on MARCH 23, 2005.
7       I further certify that the above-named
   deponent was by me first duly sworn to testify to
8  the truth, the whole truth and nothing but the
   truth concerning his knowledge in the matter of
9  the case of WARREN PARTELOW vs. COMMONWEALTH OF
   MASSACHUSETTS ET ALS, now pending in the United
10 States District Court for the District of
   Massachusetts, Western Division.
11      I further certify that the within testimony
   was taken by me stenographically and reduced to
12 typewritten form under my direction by means of
   COMPUTER ASSISTED TRANSCRIPTION; and, I further
13 certify that said deposition is a true record of
   the testimony given by said witness.
14
15      I further certify that I am neither counsel
   for, related to, nor employed by any of the
16 parties to the action in which this deposition was
   taken; and further, that I am not a relative or
17 employee of any attorney or counsel employed by
   the parties hereto, nor financially or otherwise
18 interested in the outcome of the action.
19      WITNESS my hand and seal this _____day of
   APRIL, 2005.
20
              _____
21            Joanne Coyle
              Notary Public
22            Certified Shorthand Reporter
              License No. 106693
23 My Commission Expires
   May 12, 2011
24

**96**

1       PERLIK and COYLE REPORTING
        Certified Professional Reporters
2            1331 Main Street
             Springfield, MA 01103
3  Tel. (413) 731-7931   Fax (413) 731-7451
4            April 11, 2005
5  ALFRED P. CHAMBERLAND, ESQUIRE
6  Law Office of Alfred P. Chamberland
   9 Campus Lane
7  Easthampton, Massachusetts 01027
8  RE: WARREN PARTELOW vs. COMMONWEALTH OF
       MASSACHUSETTS ET ALS
9
10 Dear Mr. Chamberland:
11      Please forward the attached original
   Signature Page-Errata Sheet, along with a copy of
12 the deposition transcript, to the deponent,
   CHARLES L. NEWMAN, for his deposition taken on
13 MARCH 23, 2005 in the above-captioned case.
14      According to the Rules of Civil Procedure,
   the deponent has thirty (30) days in which to make
15 these corrections to the transcript.
16      When the deponent has signed and noted his
   corrections on the Signature Page-Errata Sheet,
17 indicating the page number, line number, and the
   desired correction, please return the original
18 Signature Page-Errata Sheet to Mr. McDonough.
19      Thank you for your cooperation.
20           Very truly yours,
21           Joanne Coyle
             Certified Shorthand Reporter
22
23 cc: Edward J. McDonough, Jr., Esq.
   enc.